666 S.E.2d 236

Edward D. SLOAN, Jr., individually and on behalf of all others similarly situated, Appellant,

v.

The DEPARTMENT OF TRANSPORTATION, an agency of the State of South Carolina and the Commission of the Department of Transportation, Tee Hooper, Jr., Robert W. Harrell, John N. Hardee, Marion P. Carnell, William C. Turner, Bobby T. Jones, and J.M. Truluck, in their official capacities as Commissioners thereof, Respondents.

No. 26534.

Supreme Court of South Carolina.

Heard April 15, 2008.

Decided Aug. 25, 2008.

162

James G. Carpenter and Jennifer J. Miller, of The Carpenter Law Firm, of Greenville, for Appellant.

Charles E. Carpenter, Jr., and Carmen V. Ganjehsani, of Carpenter Appeals and Trial Support, of Columbia, for Respondents.

Justice WALLER.

Appellant, Edward D. Sloan, Jr., filed a declaratory judgment action challenging respondents'[1] decision to authorize an

---

1. Respondents include the South Carolina Department of Transportation and the individual Department commissioners. We will refer to respondents collectively as the DOT.

emergency procurement on a construction project in Charleston County. This is a direct appeal from the trial court's grant of summary judgment in favor of the DOT.[2] We reverse and remand.

## FACTS

In 2000, the DOT procured construction on Ladson Road in Charleston County from Eagle Construction Company (Eagle). The Ladson Road Project involved the widening of the road from two lanes to five lanes.

The DOT's director of construction, Dan Shealy, testified at deposition that Eagle consistently got behind on the project and the department granted Eagle time extensions. On February 19, 2004, there was a public meeting held between the DOT, Eagle, and the community.[3] Several milestones were set for Eagle at this meeting; however, these milestones were never met.

On August 31, 2004, Shealy wrote a letter to Eagle which noted that the completion date on the contract was August 16, 2004, but as of that date, only 73% of the project was complete. The letter also stated the following: "Based on Eagle's repeated failure to provide sufficient labor and equipment to perform the work with the project schedule ..., Eagle Construction is hereby declared to be in default on this contract." The letter further advised that Eagle had 15 days to cure the default, otherwise the contract would be terminated.

On September 2, 2004, however, the DOT rescinded the default letter and terminated the contract with Eagle based on "convenience." Shealy explained that if Eagle had been placed in default, the contract would have been turned over to the bonding company. The bonding company would then have been responsible for the process of bringing in another contractor to complete the project for the originally-contracted

---

2. This case was certified for review from the Court of Appeals pursuant to Rule 204(b), SCACR.

3. The people in the community (i.e., those in both residences and businesses along Ladson Road) were "upset" by the construction project. A sign publicizing the community meeting read: "Bring a rope."

price. Shealy estimated this process would have taken the bonding company six months. If the DOT had itself performed a competitive bidding process for a replacement contractor, Shealy estimated this would have taken four months.

Instead, approximately two weeks after the DOT terminated Eagle from the project, Sanders Brothers Construction Company (Sanders)—an existing subcontractor on the Ladson Road Project—began working on the project.[4] Although approximately five to six million dollars remained unpaid on the Eagle contract, the DOT directly negotiated a contract with Sanders for just under eight million dollars.[5] In other words, the DOT did not solicit for bids to complete the project.

On September 27, 2004, Shealy wrote a memorandum to the DOT's Executive Director, Elizabeth Mabry, which included the following language:

**Due to the significant delays on this project and enormous inconvenience to the public because of these delays,** I am requesting that we be allowed to procure a replacement contractor through the emergency procurement provisions provided by S.C.Code Ann. § 57–7–5–1620. . . .

**An emergency procurement is justified in this case based on public safety and convenience**. . . . A large number of residences and commercial businesses have been and are continuing to be adversely impacted by the construction. Traffic control devices are in place throughout the majority of the project and at many high volume intersections. These conditions are **an ongoing safety concern** and also cause significant inconvenience for residences and business owners. Procurement of a replacement contract through the standard bidding procedures would cause an unacceptable delay and increase frustration among the already frustrated public that live and conduct business in the area. In

---

4. Shealy testified that a maintenance force from Dorchester County took care of the five-mile construction area for the interim two weeks. The record reflects that Sanders began acting as the replacement contractor in mid-September 2004.

5. The contract was signed on October 21, 2004. Shealy testified that in addition to the work left undone by Eagle, there was also work that had been done which had to be corrected.

order to minimize safety concerns and disruption to the public and to prevent further delays to the completion of the project, I recommend that we procure a replacement contractor utilizing a negotiated contract method as allowed under our emergency provisions.

(Emphasis added). The Executive Director approved this request. Thereafter, the DOT Commission approved the emergency procurement at its November 18, 2004, meeting.

At his deposition, Shealy explained that the emergency conditions were "[j]ust the safety of the individuals getting in and out of their driveways; the businesses; the entrance and exits for the business; and just a general traveling through that work zone was a hazard." Yet, he conceded there is "always a hazard in a work zone, from beginning to end."

When asked what other circumstances had prompted the DOT to authorize emergency procurements, Shealy noted that Hurricane Hugo and Hurricane Floyd had both necessitated emergency procurements, for debris removal and flood prevention, respectively.

Prior to Sanders signing the contract with the DOT, Sloan had read in the newspaper about a negotiated contract between the DOT and Sanders. In a conversation with Sloan, Sanders' vice president denied any intention to sign a negotiated contract.

On October 28, 2004, Sloan sent a letter to the chairman of the DOT Commission requesting the following materials pursuant to the South Carolina Freedom of Information Act (FOIA): (1) the document terminating Eagle's contract; (2) the contract between the DOT and Sanders; and (3) the minutes of the Commission meetings during which these actions were authorized. The DOT responded to the FOIA request on November 30, 2004. Sloan filed a follow-up FOIA request on December 1, 2004, which the DOT responded to on December 16, 2004.

On January 6, 2005, Sloan filed this declaratory judgment action against the DOT. He alleged that no emergency existed to justify the DOT's procurement without a published invitation for bids. Sloan sought an injunction prohibiting respondents from paying for the construction and a declaratory

judgment that the procurement was illegal, invalid, and *ultra vires.*

Sanders completed the construction work by the March 31, 2005, deadline set in the contract.

The parties filed cross-motions for summary judgment in 2006. In an order filed May 22, 2006, the trial court granted summary judgment in favor of the DOT. The trial court found that Sloan did not have standing, the action was moot, and, on the merits, the DOT complied with the emergency procurement provisions. This appeal follows.

## ISSUES

1. Does an exception to the mootness doctrine apply to permit appellate review?
2. Does Sloan have standing to maintain this action?
3. Was the DOT's use of an emergency procurement proper?
4. Does the doctrine of laches bar Sloan's claim?

## DISCUSSION

■ This Court reviews the grant of a summary judgment motion under the same standard as the trial court pursuant to Rule 56(c), SCRCP: summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *E.g., Burriss v. Anderson County Bd. of Educ.,* 369 S.C. 443, 451, 633 S.E.2d 482, 486 (2006).

In this case, the parties agree there are no material factual disputes. Thus, the matter turns only on legal issues.

### 1. Mootness

The DOT argues that because the construction project has been completed, the trial court correctly found that the instant case is moot. We disagree.

■ This Court "will not pass on moot and academic questions or make an adjudication where there remains no actual controversy." *E.g., Curtis v. State,* 345 S.C. 557, 567, 549 S.E.2d 591, 596 (2001); *accord Sloan v. Greenville County,* 356

S.C. 531, 552, 590 S.E.2d 338, 349 (Ct.App.2003) (*Greenville County I* ) ("cases or issues which have become moot or academic in nature are not a proper subject of review").

There are, however, three exceptions to the mootness doctrine. *Curtis v. State,* 345 S.C. at 568, 549 S.E.2d at 596. First, if the issue raised is capable of repetition but generally will evade review, the appellate court can take jurisdiction. *E.g., id.; Sloan v. Department of Transp.,* 365 S.C. 299, 303, 618 S.E.2d 876, 878 (2005); *Byrd v. Irmo High Sch.,* 321 S.C. 426, 468 S.E.2d 861 (1996). "Second, an appellate court may decide questions of imperative and manifest urgency to establish a rule for future conduct in matters of important public interest." *Curtis v. State,* 345 S.C. at 568, 549 S.E.2d at 596. Third, "if a decision by the trial court may affect future events, or have collateral consequences for the parties, an appeal from that decision is not moot, even though the appellate court cannot give effective relief in the present case." *Id.; accord Sloan v. Department of Transp.,* 365 S.C. at 303, 618 S.E.2d at 878.

We find the issue of whether the DOT properly authorized the emergency procurement is one that is capable of repetition, yet will usually evade review.[6] For example, here an emergency procurement came four years into the construction project, which was then completed within about six months. The project was completed only a few months after Sloan filed suit and well before the parties filed motions for summary judgment. Therefore, the "capable of repetition but evading review" exception to mootness applies here. *See Greenville County I,* 356 S.C. at 555, 590 S.E.2d at 351 (where the Court of Appeals found that Sloan's case, which presented an issue related to the procurement code's design-build exception, was one that was likely to recur but evade review because "design-build source selection accelerates the process of awarding public works contracts and the ultimate completion of the projects themselves").

---

**6.** Although the DOT maintains this case is not capable of repetition because of its unique facts, we do not agree that this situation—a construction project which experiences substantial delays and then requires a replacement contractor—is particularly unique.

■ Moreover, a decision on the merits of this case certainly will affect future events, *to wit,* how the DOT decides to authorize emergency procurements in the future.

In addition, respondents contend that Sloan has failed to show that the case involves a question of "imperative and manifest urgency."

■ This Court has noted "the limited nature of the exception for questions of 'imperative and manifest urgency.'" *Sloan v. Greenville County,* 361 S.C. 568, 571, 606 S.E.2d 464, 466 (2004) (*Greenville County II*). In *Greenville County II,* we held that where judicial guidance exists on the legal issue presented, there is no imperative and manifest urgency for an advisory opinion.

In the instant case, however, there is no case law specifically addressing the DOT's authorization of an emergency procurement. Because this is a matter of public importance which could occur at any time (given the inherent unpredictability of emergencies), we find there is an urgent nature to this issue.

Accordingly, even though the Ladson Road Project was completed in 2005, we will address the other issues raised in the case.

## 2. Standing

■ Sloan argues his status as a taxpayer grants him standing to bring this case. Additionally, Sloan contends that the issue in this case is one of great public importance which justifies standing. We agree.

■ Generally, "a private individual may not invoke the judicial power to determine the validity of an executive or legislative act unless the private individual can show that, as a result of that action, a direct injury has been sustained, or that there is immediate danger a direct injury will be sustained." *Sloan v. Wilkins,* 362 S.C. 430, 436, 608 S.E.2d 579, 582–83 (2005). Nonetheless, "[a] taxpayer's standing to challenge unauthorized or illegal governmental acts has been repeatedly recognized in South Carolina," *Sloan v. School Dist. of Greenville County,* 342 S.C. 515, 520, 537 S.E.2d 299, 301 (Ct.App. 2000), and indeed has been repeatedly recognized as to Sloan himself. *See, e.g., id.; Sloan v. Department of Transp.,* 365

S.C. at 304, 618 S.E.2d at 878–79; *Greenville County I*, 356 S.C. at 548, 590 S.E.2d at 347.[7] Furthermore, "[s]tanding may be conferred upon a party 'when an issue is of such public importance as to require its resolution for future guidance.'" *Sloan v. Wilkins*, 362 S.C. at 436–37, 608 S.E.2d at 583 (quoting *Baird v. Charleston County*, 333 S.C. 519, 531, 511 S.E.2d 69, 75 (1999)).

The Court of Appeals has stated that "[t]he expenditure of public funds pursuant to a competitive bidding statute is of immense public importance." *Sloan v. School Dist. of Greenville County*, 342 S.C. at 524, 537 S.E.2d at 303. Numerous other jurisdictions which have addressed taxpayer standing when the issue involves competitive bidding requirements have specifically found that competitive bidding laws are for the benefit of taxpayers. *See id.* at 521–22, 537 S.E.2d at 302–03 (and cases cited therein). Indeed, the requirement that contracts "only be awarded through the process of competitive sealed bidding demonstrates the lengths to which our government believes it should go to maintain the public's trust and confidence in governmental management of public funds." *Id.* at 524, 537 S.E.2d at 303.

We find *Sloan v. School Dist. of Greenville County* is particularly instructive on this issue. In that case, the School District procured construction contracts in February 1998 for three middle schools pursuant to its own procurement code's emergency exception to the competitive sealed bid procedure. The District justified the need for the emergency procurement because it wanted the construction of the schools completed before school started in August 1999. The Court of Appeals found Sloan had standing, stating as follows: "the public interest involved is the prevention of the unlawful expenditure of money raised by taxation. Public policy demands a system of checks and balances whereby taxpayers can hold public officials accountable for their acts. Taxpayers must have some mechanism of enforcing the law." *Id.* at 523, 537 S.E.2d at 303 (citation, quotation marks, and alteration omitted).

Likewise, in this case, Sloan has standing because he has alleged a misuse of the statutory emergency procurement

---

7. In *Sloan v. Department of Transp., Sloan v. School Dist. of Greenville County,* and *Greenville County I,* Sloan raised issues related to construction procurements.

provision and therefore an unlawful expenditure by public officials.

### 3. Use of Emergency Procurement

■ Sloan argues there was no sudden emergency which justified the DOT's use of a negotiated contract. We agree.

Contracts for the construction, maintenance, and repair of highways and roads are specifically exempted from the South Carolina Consolidated Procurement Code (Procurement Code). *See* S.C.Code Ann. § 11–35–710 (Supp.2007). The procurement of construction contracts for the state highway system is governed by the following statute:

> Awards by the department of construction contracts for ten thousand dollars and more shall be made only after the work to be awarded has been advertised for at least two weeks in one or more daily newspapers in this State, but where circumstances warrant, the department may advertise for longer periods of time and in other publication media. Awards of contracts, if made, shall be made in each case to the lowest qualified bidder whose bid shall have been formally submitted in accordance with the requirements of the department. **However, in cases of emergencies, as may be determined by the Secretary of the Department of Transportation, the department, without formalities of advertising, may employ contractors and others to perform construction or repair work or furnish materials and supplies for such construction and repair work, but all such cases of this kind shall be reported in detail and made public at the next succeeding meeting of the commission.**

S.C.Code Ann. § 57–5–1620 (Supp.2007) (emphasis added). Thus, pursuant to section 57–5–1620, the general rule regarding contracts for $10,000 or more is that the work must be advertised for at least two weeks, and then the "lowest qualified bidder" must be chosen. The only exception is "in cases of emergencies, as ... determined by the Secretary[8] of the Department of Transportation."

---

8. We note that section 57–5–1620 was amended in 2007, but the only change made was substituting the word "Secretary" of the DOT for the previously used term of "Director."

The DOT contends the emergency procurement was proper because the statute requires only that the DOT Director determine that an emergency exists and the contract be made public at the next DOT Commission meeting. Because those requirements were met in this case, the DOT argues it properly complied with section 57–5–1620. Furthermore, the DOT asserts that because section 57–5–1620 does not limit what can constitute an emergency, the Director's determination is discretionary. Because the alternative to using the emergency procurement provision would have been to leave the construction project unfinished—and therefore a dangerous work zone—for four to six months, the DOT argues the facts of this case properly support its decision.

Sloan, on the other hand, argues that under the plain meaning of "emergency," there was no emergency in this case because the delays and safety hazards were present throughout the first four years of the project. Sloan also suggests the following definitions under the Procurement Code and its regulations are instructive, and that the instant case would not meet either definition.

The Procurement Code includes the following section on emergency procurements:

> Notwithstanding any other provision of this code, the chief procurement officer, the head of a purchasing agency, or a designee of either officer may make or authorize others to make emergency procurements **only when there exists an immediate threat to public health, welfare, critical economy and efficiency, or safety under emergency conditions as defined in regulations promulgated by the board;** and provided, that such emergency procurements shall be made with as much competition as is practicable under the circumstances. A written determination of the basis for the emergency and for the selection of the particular contractor shall be included in the contract file.

S.C.Code Ann. § 11–35–1570 (Supp.2007) (emphasis added).

In addition, the Procurement Code's regulations provide the following definition of emergency:

> An emergency condition is a situation which creates a threat to public health, welfare, or safety such as may arise by reason of floods, epidemics, riots, equipment failures, fire

loss, or such other reason as may be proclaimed by either the Chief Procurement Officer or the head of a purchasing agency or a designee of either office. The existence of such conditions must create an immediate and serious need for supplies, services, information technology, or construction that cannot be met through normal procurement methods and the lack of which would seriously threaten:

(1) the functioning of State government;

(2) the preservation or protection of property; or

(3) the health or safety of any person.

S.C.Code Ann. Regs. § 19–445.2110 (Supp.2007).

We agree that these definitions provide useful guidance, in a procurement setting, as to what constitutes an emergency. Moreover, we find that the plain meaning of "emergency" also provides a guideline for interpreting section 57–5–1620. *See e.g., Key Corp. Capital, Inc. v. County of Beaufort,* 373 S.C. 55, 59, 644 S.E.2d 675, 677 (2007) (where a statute's language is plain, unambiguous, and conveys a clear meaning, the court has no right to impose another meaning); *Sloan v. Hardee,* 371 S.C. 495, 498–99, 640 S.E.2d 457, 459 (2007) ("When a statute's terms are clear and unambiguous on their face, there is no room for statutory construction and a court must apply the statute according to its literal meaning.").

An emergency is, by its very nature, a sudden, unexpected onset of a serious condition. *See The American Heritage Dictionary* 448 (2nd College ed.1982) (emergency defined as "[a]n unexpected situation or sudden occurrence of a serious and urgent nature that demands immediate action"); *Black's Law Dictionary* 361 (6th ed.1991) (defining emergency as "[a] sudden unexpected happening; an unforeseen occurrence or condition; ... a sudden or unexpected occasion for action").

Here, there was a five-mile construction zone which, according to the DOT, had "safety concerns." These hazards, however, had existed throughout the course of the construction project and likely would have been present to some degree in any major construction project of this type. Put simply, these safety concerns did not appear unexpectedly in September 2004 thereby suddenly creating a public safety risk. Furthermore, the record reflects that any urgency felt by the DOT was, in large part, due to the delays on the project and the

resultant frustration by the affected community. These factual circumstances, however, do not constitute an emergency under section 57–5–1620, as that plain and ordinary term was likely intended by the Legislature. *See e.g., Key Corp. Capital, Inc., supra; Sloan v. Hardee, supra.*[9]

We hold there was no emergency that existed in September 2004 to substantiate the emergency procurement authorized by the DOT. Accordingly, we find the trial court erred in finding that the DOT complied with the emergency procurement provision found in section 57–5–1620.

### 4. Laches

■ As an additional sustaining ground, the DOT argues the doctrine of laches bars Sloan's claims. We disagree.

■ "Under the doctrine of laches, if a party, knowing his rights, does not seasonably assert them, but by unreasonable delay causes his adversary to incur expenses or enter into obligations or otherwise detrimentally change his position, then equity will ordinarily refuse to enforce those rights." *Chambers of S. C., Inc. v. County Council for Lee County,* 315 S.C. 418, 421, 434 S.E.2d 279, 280 (1993).

Here, the DOT signed a contract with Sanders in October 2004. Thereafter, Sloan sought documents through a FOIA request, and then filed suit in January 2005. There was no delay, and thus, laches does not apply.

---

**9.** *See also Marshall v. Pasadena Unified Sch. Dist.,* 119 Cal.App.4th 1241, 15 Cal.Rptr.3d 344 (2004). In *Marshall,* the court found that after a construction contract had been terminated for convenience, the avoidance of competitive bidding through an emergency resolution was improper. There, the definition of emergency was "a sudden, unexpected occurrence that poses a clear and imminent danger, requiring immediate action to prevent or mitigate the loss or impairment of life, health, property, or essential public services." *Id.* at 348. The court stated that "[t]he purported emergency stemmed from the District's decision to terminate its contract with [the original contractor] for the District's own 'convenience.' That event was not a 'sudden, unexpected occurrence' posing a clear and imminent danger requiring prompt action to protect life, health, property, or essential public services." *Id.* at 358. The instant case is similar in that the need for a replacement contractor came about because of the DOT's termination of the contract with Eagle **for the DOT's convenience.** Given the history of the contract with Eagle, the termination of the contract cannot reasonably be viewed as a sudden, unexpected occurrence.

## CONCLUSION

For the above-stated reasons, we find the DOT's procurement was invalid under section 57–5–1620. Therefore, the decision of the circuit court is reversed and remanded for further proceedings consistent with this opinion.

**REVERSED AND REMANDED**

TOAL, C.J., MOORE and BEATTY, JJ., concur.
PLEICONES, J., dissenting in a separate opinion.

Justice PLEICONES.

I respectfully dissent and adhere to the position I set forth in *Sloan v. Dept. of Transp.*, 365 S.C. 299, 618 S.E.2d 876 (2005). In my opinion, Sloan lacks standing to bring this action because he cannot allege a particular harm. Other potential plaintiffs in this case, the construction companies who did not have the opportunity to bid on the completion of the project, have interests greater than Sloan in seeing the bidding process followed as required by law. Accordingly, because there are potential parties capable of alleging direct and distinct harm in this case, I would hold that Sloan does not have standing.