744 S.E.2d 521

**SOUTH CAROLINA PUBLIC INTEREST FOUNDATION and Edward D. Sloan, Jr., individually, and on behalf of all others similarly situated, Petitioners,**

v.

**SOUTH CAROLINA TRANSPORTATION INFRASTRUCTURE BANK, Robert W. Harrell, Jr., in his official capacity as Speaker of the S.C. House of Representatives, John E. Courson in his official capacity as President Pro Tempore of the S.C. Senate, and the State of South Carolina, Respondents.**

Appellate Case No. 2012–207128.

Nos. 27266.

Supreme Court of South Carolina.

Heard June 19, 2012.

Decided June 12, 2013.

642

L. Warren Clayton, III and James G. Carpenter, both of Carpenter Law Firm, PC, of Greenville, for Petitioners.

Robert E. Stepp, Robert E. Tyson, Jr., Alexis K. Lindsay, all of Sowell, Gray, Stepp, & Laffitte, LLC, of Columbia, Attorney General Alan M. Wilson, Deputy Attorney General Robert D. Cook, and Assistant Deputy Attorney General J. Emory Smith, Jr., all of Columbia, Kenneth M. Moffitt, John P. Hazzard, V, and Michael R. Hitchcock, all of Columbia, Charles Fennell Reid and Bradley Scott Wright, both of Columbia, for Respondents.

Justice HEARN.

Edward D. Sloan and the South Carolina Public Interest Foundation [1] (collectively, Sloan) instituted this suit in our original jurisdiction to determine whether the South Carolina Transportation Infrastructure Bank is constitutional. In particular, Sloan alleges Section 11–43–140 of the South Carolina Code (2011), which governs the composition of the Bank's Board of Directors, violates both the dual office holding and the separation of powers prohibitions of the South Carolina Constitution. We find both challenges fail and that section 11–43–140 is constitutional.

## FACTUAL/PROCEDURAL BACKGROUND

The Bank, a corporate and political instrumentality established by legislative enactment, is responsible for selecting and assisting "in financing major qualified projects by providing loans and other financial assistance to government units and private entities for constructing and improving highway and transportation facilities." S.C.Code Ann. § 11–43–120 (2011).

---

1. The South Carolina Public Interest Foundation is a not-for-profit corporation "dedicated to the public interest, including the upholding and proper application of the South Carolina Constitution."

In doing so, the Bank may, among other things, "make loans to qualified borrowers to finance the eligible costs of qualified projects and to acquire, hold, and sell loan obligations at prices and in a manner as the [B]oard determines advisable" and "borrow money through the issuance of bonds and other forms of indebtedness as provided in this chapter." *Id.* § 11–43–150(5) & (14) (2011). Since 1998, the Bank has expended nearly three billion dollars for major transportation projects.

Section 11–43–140 establishes the composition of the Board as follows:

> [T]he Chairman of the Department of Transportation Commission, ex officio; one director appointed by the Governor who shall serve as chairman; one director appointed by the Governor; one director appointed by the Speaker of the House of Representatives; one member of the House of Representatives appointed by the Speaker, ex officio; one director appointed by the President Pro Tempore of the Senate; and one member of the Senate appointed by the President Pro Tempore of the Senate, ex officio.

Since the Bank's creation, no more than two legislators have served as directors at any one time. The legislators currently serving on the Board are the Honorable Hugh K. Leatherman, Chairman of the Senate Finance Committee, and the Honorable Harry B. "Chip" Limehouse, Vice–Chairman of the House Ways and Means Committee. We granted Sloan's petition to bring a declaratory judgment action in our original jurisdiction challenging the constitutionality of section 11–43–140.

## ISSUES PRESENTED

I. Does Sloan have standing to bring this action?

II. Does section 11–43–140 violate the South Carolina Constitution's dual office holding prohibitions in Article III, Section 24; Article VI, Section 3; and Article XVII, Section 1A by allowing legislators to serve as directors on the Board?

III. Does section 11–43–140 violate the South Carolina Constitution's separation of powers provisions in Article I, Section 8 by allowing legislators to serve as directors on the Board?

## STANDARD OF REVIEW

"This Court has a limited scope of review in cases involving a constitutional challenge to a statute because all statutes are presumed constitutional and, if possible, will be construed to render them valid." *State v. Neuman*, 384 S.C. 395, 402, 683 S.E.2d 268, 271 (2009). "A statute will not be declared unconstitutional unless its invalidity appears so clearly as to leave no doubt that it violates some provision of the constitution." *Segars–Andrews v. Judicial Merit Selection Comm'n*, 387 S.C. 109, 118, 691 S.E.2d 453, 458 (2010). A "legislative act will not be declared unconstitutional unless its repugnance to the constitution is clear and beyond a reasonable doubt." *Id.*

## LAW/ANALYSIS

### I. STANDING

As a threshold matter, Respondents argue Sloan does not have standing to assert his claims because he does not allege a particularized injury and has not shown that this matter falls within the public importance exception. We disagree.

A party seeking to establish standing bears the burden of proving it. *See Sea Pines Ass'n for Prot. of Wildlife, Inc. v. S.C. Dep't of Natural Res.*, 345 S.C. 594, 601, 550 S.E.2d 287, 291 (2001). As a general rule, a private individual may not use the judicial process to scrutinize the validity of a legislative act without showing that the act in question caused or threatens to cause a direct injury to the individual. *Sloan v. Dep't of Transp.*, 379 S.C. 160, 169, 666 S.E.2d 236, 241 (2008). However, the rule of standing is not inflexible and standing may be conferred where the issue is one of public importance. *Sloan v. Wilkins*, 362 S.C. 430, 436, 608 S.E.2d 579, 583 (2005). The public importance exception grants standing to a party who has not suffered a particularized injury where the issue involved is of such public importance that its resolution is required for future guidance. *ATC S., Inc. v. Charleston Cnty.*, 380 S.C. 191, 198, 669 S.E.2d 337, 341 (2008). "It is this concept of 'future guidance' that gives meaning to an issue which transcends a purely private matter

and rises to the level of public importance." *Id.* at 199, 669 S.E.2d at 341.

Sloan has not asserted he has suffered a particularized harm or injury as a result of section 11–43–140, but we find this case fits within the public importance exception. While we are mindful that we must be cautious with this exception, lest it swallow the rule, this is the precise instance where the public importance exception should apply. Sloan presents a colorable claim that the Board is unconstitutionally comprised, casting a cloud of illegitimacy which could marginalize the important decisions of the Board. We find resolution of this question is certainly of importance and concern to the public and therefore hold Sloan has standing to bring this challenge.

## II. DUAL OFFICE HOLDING

Sloan first argues that section 11–43–140 violates the constitution because concurrent service on the Board and in the General Assembly constitutes dual office holding.[2] Because we believe the ex officio exception to dual office holding applies, we disagree.

The South Carolina Constitution prohibits members of the General Assembly from holding another office during their service in the legislature, both expressly and by virtue of the repeated general prohibitions against dual office holding. *See* S.C. Const. art. III, § 24 ("No person is eligible to a seat in the General Assembly while he holds any office or position of profit or trust under this State . . . ."); S.C. Const. art. VI, § 3 ("No person may hold two offices of honor or profit at the same time."); S.C. Const. art. XVII, § 1A ("No person may hold two offices of honor or profit at the same time . . . ."). This Court, however, has recognized an "ex officio" or "incidental duties" exception where "there is a constitutional nexus in terms of power and responsibilities between the first office and the 'ex officio' office." *Segars–Andrews*, 387 S.C. at 126, 691 S.E.2d at 462. Ex officio is defined as "[b]y virtue or because of an office; by virtue of the authority implied by office." *Black's Law Dictionary* 267 (3d pocket ed.2006).

---

2. None of the Respondents challenges the assertion that membership on the Board qualifies as serving in an office for the purposes of the constitutional analysis.

Sloan argues that the ex officio exception is inapplicable here because service on the Board does not relate to the duties of a legislator. In support of his position, Sloan relies heavily on *Ashmore v. Greater Greenville Sewer District*, 211 S.C. 77, 44 S.E.2d 88 (1947), in which we considered a constitutional challenge to the statute creating a board of trustees for an auditorium in Greenville. *Id.* at 85, 44 S.E.2d at 91. There, we found a statutory requirement that the senator and representative from Greenville County serve as members on the board of trustees ran afoul of the dual office holding provisions of the constitution. *Id.* at 90, 44 S.E.2d at 94. However, we clarified that our ruling was not applicable to "those officers upon whom other duties relating to their respective offices are placed by law" and would "not affect the state of the law with respect to ex officio officeholding." *Id.* at 92, 44 S.E.2d at 95.

More recently, in *Segars–Andrews*, we elucidated the framework for determining whether a second office is being held ex officio. There, we considered, *inter alia*, a dual office holding challenge against legislators serving as members of the Judicial Merit Selection Commission (JMSC). 387 S.C. at 123–28, 691 S.E.2d at 461–64. The JMSC possesses the power, both statutorily and constitutionally, to evaluate the qualifications and fitness of all judicial candidates for election or re-election. *Id.* at 114, 691 S.E.2d at 456. A candidate must first be found qualified by the JMSC to be considered by the legislature. *Id.* After the JMSC determined Judge Segars–Andrews was not qualified for re-election, she brought multiple constitutional challenges against the JMSC. *Id.* at 116, 691 S.E.2d at 457. In addressing the dual office holding allegation, we found that although a position on the JMSC qualified as a constitutional office, the ex officio exception applied because service on the JMSC by the legislators was "properly characterized as incidental to their legislative duties." *Id.* at 125, 691 S.E.2d at 462. We further concluded there must be a "constitutional nexus in terms of power and responsibilities" between the two offices. *Id.* at 126, 691 S.E.2d at 462. Moreover, we distinguished the case from *Ashmore* by noting that when members of the General Assembly also serve on the JMSC, "such service is reasonably incidental to the full and effective exercise of their legislative powers." *Id.* at 127, 691 S.E.2d at 463.

We held that because the constitution specifically charged the General Assembly with the task of electing members of the judiciary, legislative members of the JMSC exercised the powers and responsibilities which they were already constitutionally granted. *Id.* at 125–26, 691 S.E.2d at 462.

Here, we likewise find the necessary constitutional nexus between service on the Board and service in the legislature. The Bank's purpose "is to select and assist in financing major qualified projects by providing loans and other financial assistance to government units and private entities for constructing and improving highway and transportation facilities necessary for public purposes including economic development." S.C.Code Ann. § 11–43–120(C) (2011). To this end, the Board has the power to "borrow money through issuance of bonds and other forms of indebtedness." S.C.Code Ann. § 11–43–150(14) (2011). Similarly, the constitution vests the General Assembly with the power to set the terms and conditions of general obligation debt of the State. S.C. Const. art. X, § 13(6). Because it is within the province of the legislature to incur debt on behalf of the State, we find a sufficient constitutional nexus between the powers and responsibilities of the directors on the Board and members of the General Assembly.[3] Moreover, this case is also distinguishable from *Ashmore* because like service on the JMSC in *Segars–Andrews,* service by legislators on the Board is "reasonably incidental to the full and effective exercise of their legislative powers." *Segars–Andrews,* 387 at 127, 691 S.E.2d at 463.

Accordingly, we hold the ex officio exception applies and the statute does not violate the provisions barring dual office holding.

## III. SEPARATION OF POWERS

■ Sloan also argues that section 11–43–140 violates the constitutional provisions regarding separation of powers be-

---

3. We realize the Board may not be performing purely legislative acts, but the discussion of whether members of the General Assembly can serve on a Board which performs some executive functions relates to the separation of powers challenge, which is discussed *infra,* Part III. Whether the ex officio exception applies merely requires an inquiry into whether there is a constitutional nexus between the powers and responsibilities of the two offices.

cause service on the Board by legislators results in members of the legislative branch performing executive functions. Because we believe the overlap of the two branches falls within constitutional bounds, we disagree.

 The preservation of a separation of powers has been a basic tenet of democratic societies at least since Baron de Montesquieu warned that "[t]here would be an end of everything, were the same man or the same body, whether of the nobles or of the people, to exercise those three powers, that of enacting laws, that of executing the public resolutions, and of trying the causes of individuals." *See* Montesquieu, *The Spirit of Laws* 152 (Thomas Nugent trans. 1949). Consistent with this notion, the South Carolina Constitution requires the branches of government be "forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other." S.C. Const. art. I, § 8. "One of the prime reasons for separation of powers is the desirability of spreading out the authority for the operation of the government." *State ex rel. McLeod v. Yonce*, 274 S.C. 81, 84, 261 S.E.2d 303, 304 (1979). "The legislative department makes the laws[,] the executive department carries the laws into effect, and the judicial department interprets and declares the laws." *Id.* at 84, 261 S.E.2d at 305. This delineation of powers amongst the branches "prevents the concentration of power in the hands of too few, and provides a system of checks and balances." *State ex rel. McLeod v. McInnis*, 278 S.C. 307, 312, 295 S.E.2d 633, 636 (1982).

Nevertheless, "[s]eparation of powers does not require that the branches of government be hermetically sealed." 16A Am.Jur.2d *Constitutional Law* § 244. Accordingly, allowing some degree of overlap between the branches has been a feature of our government since the founding of the Republic. Our founding fathers embraced the celebrated writings of Montesquieu, yet concluded that a certain amount of encroachment was permissible, even under his ideology:

[I]t may clearly be inferred that, in saying "There can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates," or, "if the power of judging be not separated from the legislative and

executive powers," [Montesquieu] did not mean that these departments ought to have no *partial agency* in, or no *control* over, the acts of each other. His meaning, as his own words import, and still more conclusively as illustrated by the example in his eye, can amount to no more than this, that where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution are subverted.

*The Federalist* No. 47, at 250–51 (James Madison) (The Gideon ed., 2001). Thus, we have acknowledged that "there is tolerated in complex areas of government of necessity from time to time some overlap of authority and some encroachment to a limited degree." *McInnis*, 278 S.C. at 313, 295 S.E.2d at 636 (citing *State ex rel. McLeod v. Edwards*, 269 S.C. 75, 83, 236 S.E.2d 406, 409 (1977)).

In South Carolina, this allowance of overlap between the branches is somewhat singular in the extensive involvement of the legislature in the powers of the executive and judiciary. Historically, this State has been considered a "legislative state" with a practice of "[j]oining legislators with executive branch decision makers" for a "commission approach to government." Cole Blease Graham, Jr., *The South Carolina Constitution: A Reference Guide* 46 (2007).

The path leading to this collaborative governance where the General Assembly wields extensive power is discussed at length by Professor Underwood in his excellent treatise on our State constitution. While recognizing that no one force can be identified as being responsible for "South Carolina's unique form of government in which the legislative takes a permanent position among the three theoretically equal branches of government," Underwood does discuss several causative factors. James L. Underwood, *The Constitution of South Carolina, Volume I: The Relationship of the Legislative, Executive, and Judicial Branches* 13 (1986).

Among the historical forces that created the impetus for the acquisition of such powers by the colonial Commons House were abuses by the royal executive that created an inbred suspicion of concentrated executive power in the South Carolina political leadership. In the view of Commons

> these royal executive excesses threatened the economy of the province, frustrated their own ambitions by reserving choice judicial and other positions for British placemen and threatened the prerogatives of Commons to judge the proper composition of its own membership. The climate favorable to the legislative style of government was enhanced by a small, homogeneous elite who found it convenient to rule as a group through the legislature as a form of committee of peers. Admiration and emulation of the constitutional precedents of British government with its example of growing parliamentary power proved to be a seductive model for the South Carolinians, many of whom were lawyers trained at English Inns of Court.

*Id.* at 21–22. Although our system has retrenched somewhat from the colonial levels of legislative control,[4] the influence of the legislature in the activities of the other branches remains firmly girded in the operation of our government.

Consequently, our rich and unique constitutional history has resulted in a system of government which does not lend itself to a neat, compartmentalized, or "cookie-cutter" approach. Rather, to counteract the destructive forces which can emanate from strictly defined and jealously guarded power bastions, certain "power fusion devices" have developed to enable the branches to work together in a cooperative fashion. *Id.* at 3. A prime example of one of these collaborative devices is the State Budget and Control Board. *See Edwards,* 269 S.C. at 83, 236 S.E.2d at 409.

With this historical framework in mind, we now turn to Sloan's claim that Section 11–43–140 violates the constitutional separation of powers provision.

In answering this question, our prior decision in *Tall Tower, Inc. v. South Carolina Procurement Review Panel,* 294 S.C. 225, 363 S.E.2d 683 (1987), is particularly instructive. There, we identified two major criteria to determine whether a "creature of legislative enactment" which draws membership from different branches of government, like the Board, is

---

4. Professor Underwood offers several "countervailing forces" which have worked over time to moderate the vast power of the General Assembly including the tradition of judicial review and the strengthening of the office of the Governor. *Id.* at 27–85.

constitutional under a separation of powers challenge: "(1) the legislators should be a numerical minority, and (2) the body should represent a cooperative effort to make available to the executive department the special knowledge and expertise of designated legislators in matters related to their function as legislators." *Id.* at 230, 363 S.E.2d at 685–86

In arguing that the Board does not have a legislative minority, Sloan first reasons that although only two members of the legislature currently sit on the Board, there is a possibility that as many as four legislators could sit on the seven-member Board, which would constitute a majority. Initially, we note that since its inception, the Board has never had more than two legislators serve as directors at one time. Additionally, Sloan's contention rests on an illogical reading of the statute.

The Board is appointed as follows:

[T]he Chairman of the Department of Transportation Commission, ex officio; one director appointed by the Governor who shall serve as chairman; one director appointed by the Governor; one director appointed by the Speaker of the House of Representatives; one *member* of the House of Representatives appointed by the Speaker, *ex officio;* one director appointed by the President Pro Tempore of the Senate; and one *member* of the Senate appointed by the President Pro Tempore of the Senate, *ex officio.*

S.C.Code Ann. § 11–43–140 (emphasis added). The statute expressly provides that the Speaker and President Pro Tempore may appoint a member of the House and Senate, respectively, to serve ex officio, but the other two appointments are neither specifically delineated as members nor constrained to be held ex officio. While it is true there is no express prohibition against the other appointees being members, the same is true for any of the positions except for the Chairman of the Department of Transportation Commission. For example, it could be alleged just as easily that the Governor could choose to appoint a director who was also a legislator. Were we to hold that the absence of language specifically restricting the number of legislators who can serve on such a board rendered the statute constitutionally defective, we would upend countless boards across the State. Furthermore, the fact

that neither leaders of the General Assembly nor the Governor have appointed legislators to these other positions demonstrates that the statute is capable of constitutional application.

Sloan further argues that even if only two of the directors are members of the legislature, the fact that the Speaker and President Pro Tempore appoint a majority of the directors constitutes de facto control. He relies mainly on language from *Tall Tower* which, in approving the constitutionality of a statute, noted that in the nine-member panel in question, the maximum number of legislators possible was four so "[t]he five executive appointees will always constitute a majority." *Tall Tower*, 294 S.C. at 230, 363 S.E.2d at 686. Sloan therefore reasons that the important distinction in that case was that the executive appointees were in the majority, not that the legislators were in the minority. Thus, in this case, because the Board does not have a majority of executive appointees, it fails the test used in *Tall Tower*. However, this conclusion ignores the actual language of the *Tall Tower* test which specifically required that "*legislators* should be a numerical minority." *Id.* at 230, 363 S.E.2d at 685 (emphasis added). Here, as discussed above, the statute allows for two directors to be simultaneously members of the General Assembly, which leaves them in the minority. Therefore, we do not agree that because the President Pro Tempore and the Speaker can appoint two other directors, the legislature necessarily dominates the board.[5]

The second prong of *Tall Tower* requires that "the body should represent a cooperative effort to make available to the executive department the special knowledge and expertise of designated legislators in matters related to their function as

---

5. We therefore also disagree with Justice Pleicones's conclusion that *Tall Tower* requires us to hold that the Board violates the separation of powers. As discussed previously, the statute indicates that only two legislators can be appointed to the Board in an ex officio capacity. This is consistent with the language and the test of *Tall Tower*. The executive appointees, of whom there are three, will always be in a majority over the two legislators. While Justice Pleicones asserts it "defies logic" to hold that power of appointment is not tantamount to control, we cannot agree that because the legislature has selected a person for a position, that individual has been stripped of his independence. Indeed, to do so would undermine the integrity of many boards and institutions in this State, including the judiciary.

legislators." *Id.* at 230, 363 S.E.2d at 685–86. Sloan argues the statute fails this element because it does not expressly state that the legislator appointees must have the requisite special knowledge and expertise to increase cooperation between the executive and the legislative branches. However, this contention imposes an unnecessary requirement upon legislative enactments and ignores our deference to the legislature in these appointments. Tellingly, *Tall Tower* did not expressly mandate inclusion of language about the legislator's special knowledge and expertise. Instead, it noted that "[the Court] necessarily give[s] great weight to legislative discretion in the designation of which members of which committees possess the requisite 'special knowledge and expertise' to increase cooperation between the executive and legislative branches." *Id.* at 231–32, 363 S.E.2d at 686. We believe the composition of the Board at issue here enables it to benefit from the legislator members' wisdom without being dominated by them. Therefore, ever mindful of the presumption of constitutional validity, we conclude the Board's composition satisfies both prongs of *Tall Tower* and thus survives the separation of powers challenge.

## CONCLUSION

For the foregoing reasons, we find Sloan has standing to bring this challenge but nevertheless find section 11–43–140 is constitutional under both a dual office holding and separation of powers challenge.

TOAL, C.J., BEATTY and KITTREDGE, J., concur.

PLEICONES, J., concurring in result in a separate opinion.

KITTREDGE, J., concurring in a separate opinion in which TOAL, C.J., concurs.

Justice PLEICONES.

I have, in previous decisions, stated my opposition to the "public importance" exception to standing. In my view, standing should not be conferred on a party who cannot allege a particular harm when another potential plaintiff has interests greater than the plaintiff's. *See Energy Research Foundation*

*v. Waddell,* 295 S.C. 100, 102, 367 S.E.2d 419, 420 (1988); *Sloan v. Department of Transportation,* 379 S.C. 160, 175, 666 S.E.2d 236, 244 (2008) (Pleicones, J., dissenting). I completely agree that the constitutionality of the structure and composition of the board of the South Carolina Public Infrastructure Bank (the board) is of great public importance. Nonetheless, I would conclude that, despite the manifest public importance of the issues raised by Petitioner, the executive branch has a greater interest than Petitioner in seeing that the General Assembly does not intrude on executive powers. Thus, I would hold that Petitioner lacks standing to bring this challenge. I therefore concur in result.

Although the analysis should end with the determination that Petitioner lacks standing to bring this challenge, I address the merits because I disagree with the majority's analysis.

On the question whether the composition of the board is unconstitutional, we must initially determine whether the board is legislative or executive. In *Bramlette v. Stringer,* the Court considered the constitutionality of an act, challenged as a violation of the separation of powers, that authorized the Greenville County legislative delegation to determine the amount and method of selling bonds for highway construction and to select the particular roads to be constructed and improved. 186 S.C. 134, 195 S.E. 257 (1938). These functions, the Court found, "are fully discretionary acts, relating exclusively to the executive functions. . . ." *Id.* at 149–50, 195 S.E. at 264. The board of the Infrastructure Bank here is charged with the power to issue bonds and other debt, determine which projects to fund, and make loans. Thus, the board and its functions are undoubtedly executive.

The *Bramlette* Court, having identified the functions at issue as executive, unanimously struck down the act, finding that the provisions permitting performance of such acts by a legislative delegation "are clear violations of [the separation of powers mandate], and are therefore null and void." 186 S.C. at 149–50, 195 S.E. at 264. In the course of its decision, the Court examined those cases in which some "executive" functions had been found permissible as incidental to the legislative function, but it did not discover a fluid boundary between

the legislative and executive branches.[6] Rather, it identified as permissible to the legislative branch "executive" functions so unremarkable as hiring and firing its own accountants engaged in audits of executive bodies. *Id.* at 146–47, 195 S.E. at 262.

The General Assembly in subsequent years, having been denied the option of creating executive boards composed exclusively of legislators, has created executive boards on which it has designated some, though not all, seats to legislators or to legislative appointees. In *Ashmore v. Greater Greenville Sewer District,* we rejected this overlap of government branches as well, striking down as unconstitutional an executive board where two of its thirteen members were designated to be legislators. 211 S.C. 77, 44 S.E.2d 88 (1947). The board's composition is unconstitutional under *Ashmore.*

Subsequently, however, the Court reversed course and approved some limited seating of legislative members on executive bodies. In *State ex rel. McLeod v. Edwards,* the Court approved such minority membership, explaining that it was intended to "mak[e] available to the executive department the special knowledge and expertise" of the legislative members. 269 S.C. 75, 83, 236 S.E.2d 406, 409 (1977). While thus seeking to characterize the legislators' function on the board as incidental to the legislative function, the *Edwards* Court also found it "[i]mportant" that "the General Assembly ha[d] been careful to put the legislative members in a minority position on [the executive body]." *Id.* at 82–83, 236 S.E.2d at 408–09.

---

**6.** The majority cites to secondary sources as authority for the proposition that South Carolina has traditionally used a commission approach to government rather than to this Court's precedents, the only real authorities on the interpretation of our constitution's separation of powers mandate. As the discussion herein demonstrates, in my view these authorities do not interpret that mandate as permissively as does the majority. Moreover, this Court's recent decision in *State v. Langford,* 400 S.C. 421, 735 S.E.2d 471 (2012), gave no weight to our state's longstanding tradition of solicitor control of the docket. Notwithstanding that executive and judicial functions necessarily interact when court proceedings are initiated in criminal prosecutions, the Court held that solicitor control of the docket "is not a grey area where some encroachment can be tolerated, but rather a complete invasion into the court's domain." *Id.* at 435, 735 S.E.2d at 478.

In my view, *Edwards* was wrongly decided because it departed from the Court's prior adherence to the traditional doctrine of separation of powers requiring clear boundaries between the two branches and disapproving any legislative membership on executive boards. As the *Ashmore* Court implicitly recognized, any legislative presence on an executive body constitutes legislative exercise of executive powers, since even a single voting member of an executive body may have opportunities to alter the outcome of a number of its decisions. If the true purpose of seating legislators on such bodies were to make their special knowledge and expertise available to the executive department, the power to vote would be unnecessary.

Notwithstanding my disagreement with *Edwards* and its progeny, even under our current jurisprudence the composition of the board of the Infrastructure Bank is impermissible. In *Tall Tower, Inc. v. South Carolina Procurement Review Panel*, while it again approved mixed membership on an executive body, the Court articulated the test for a mixed-membership board. 294 S.C. 225, 363 S.E.2d 683 (1987). The Court explained that legislative membership on an executive body is permissible under two conditions: "(1) the legislators should be a numerical minority; and (2) the body should represent a cooperative effort to make available to the executive department the special knowledge and expertise of designated legislators in matters related to their function as legislators." *Id.* at 230, 363 S.E.2d at 685–86. The *Tall Tower* Court considered all possible compositions permitted by the statute for the nine-member body: "Two legislative positions are statutorily guaranteed, with a possibility of four legislators maximum. The five executive appointees will always constitute a majority." *Id.* at 230, 363 S.E.2d at 686. Here, two legislative positions are statutorily guaranteed, with a possibility of four legislators maximum, but only three seats are designated for executive officers or appointees.

The majority explains that *Tall Tower* was concerned only with the number of seats guaranteed to legislators and not with the branch by which members are appointed. I disagree. As is clear from the foregoing quotation, the *Tall Tower* Court assumed that the General Assembly might appoint legislators to all four seats for which it held appointment power and

approved the composition only because a majority of *executive appointees* was guaranteed. In contrast, the board of the Infrastructure Bank is guaranteed always to be dominated by legislative appointees. Moreover, as a practical matter, it defies logic to assert that the board is not controlled by the legislative branch when that branch appoints the majority of its members, regardless whether those members are themselves legislators.

I also respectfully disagree with the suggestion that a constitutional nexus exists for the exercise by legislators of the board's function in article X, section 13, of our constitution. *See Segars–Andrews v. Judicial Merit Selection Commission*, 387 S.C. 109, 126, 691 S.E.2d 453, 462 (2010) (approving legislative membership on Judicial Merit Selection Commission as incidental to the constitutionally mandated legislative function of electing judges). Article X, section 13, concerns the creation of state debt and seeks to protect taxpayers by limiting the amount of debt that may be incurred. *Robinson v. White*, 256 S.C. 410, 416, 182 S.E.2d 744, 747 (1971). In my view, nothing in the wording of this section suggests any constitutional nexus for legislative appointees to participate in the issuance of bonds and indebtedness or select recipients or projects to be financed. The language used in Article X, section 13, in no way suggests deviation from ordinary constitutional procedures designed to separate the legislative and executive functions. *See* S.C. Const. art. III, § 18 (bicameralism); art. IV, § 21 (presentment). It speaks only in terms of the General Assembly enacting legislation to authorize the incurring of debt.[7] As the *Bramlette* Court explained, when the General Assembly sought to permit a delegation of its members to participate in the issuance of bonds,

---

7. *See* art. X, § 13(4) ("In each act authorizing the incurring of general obligation debt the General Assembly shall...."); (5) ("If general obligation debt be authorized by (a) two-thirds of the General Assembly; or (b) [referendum] ... there shall be no conditions or restrictions ... except ... those ... imposed in the authorization...."); (6) ("on such terms and conditions as the General Assembly may **by law** prescribe"); (7) ("under such terms and conditions as the General Assembly may prescribe **by law**"); (8) ("under terms and conditions which the General Assembly may prescribe **by law**"); (9) ("The General Assembly may **authorize** the State or any of its agencies, authorities or institutions **to incur** indebtedness...."; "upon such terms and conditions as the General Assembly may prescribe **by law**") (all emphases added).

It is conceded that the Legislature itself, in the act, could have specified the amount, and method of selling bonds, and designated the roads to be constructed and improved with the funds. It is well settled that the Legislature may pass any act which is not prohibited by the State or Federal Constitutions. But the act must be complete when it comes from the hands of the Legislature; nothing can be added to, or taken away from, the act [by members of the legislative branch] after it leaves the lawmaking body.... Article 3 of the State Constitution prescribes the procedure for enacting laws. Among other requirements, the act must be passed during a session of the Legislature, by a majority vote of both branches of that body, after having been read three times, and approved by the Governor. All such requirements are mandatory. So any action now on the part of the Greenville County Legislative Delegation, pursuant to said act, cannot amount to the enactment of legislation, and if said act was incomplete when it came from the hands of the Legislature, it cannot be finished by the Greenville County Legislative Delegation in the manner provided for in said act.

186 S.C. 134, 136–37, 195 S.E. 257, 258 (internal citations omitted).

Thus, I would hold that § 11–43–140 violates article I, section 8, of the South Carolina Constitution, and that it is unnecessary to reach the question whether § 11–43–140 violates the dual office holding prohibition of our constitution. Nevertheless, because Petitioner lacks standing to bring this challenge, I concur in result.

Justice KITTREDGE.

I join Justice Hearn's excellent and scholarly majority opinion. I write separately to set forth my understanding of the constitutional issues involved, as I, unlike Justice Pleicones, would recognize differences in the analytical frameworks of the two constitutional challenges. In short, I would not conflate the dual-office and separation of powers challenges.

Concerning the dual-office holding challenge, the South Carolina Constitution contains several provisions prohibiting dual-office holding. *See* S.C. Const. art. III, § 24 ("No person

is eligible to a seat in the General Assembly while he holds any office or position of profit or trust under this State . . . ."); S.C. Const. art. XVII, § 1A ("No person may hold two offices of honor or profit at the same time . . . ."); S.C. Const. art. VI, § 3 ("No person may hold two offices of honor or profit at the same time."). Respondents concede, as they must, that service on the South Carolina Transportation Infrastructure Bank's (Bank) Board of Directors is an office. The Bank's Board of Directors has extensive power to "select and assist in financing major qualified projects by providing loans and other financial assistance to government units and private entities for constructing and improving highway and transportation facilities necessary for public purposes including economic development." S.C.Code Ann. § 11–43–120(C) (Supp. 2011).

I concur with the majority's recognition that the "ex officio" or "incidental duties" exception "may be properly invoked only where there is a constitutional nexus in terms of power and responsibilities between the first office and the 'ex officio' office." *Segars–Andrews v. Judicial Merit Selection Comm'n,* 387 S.C. 109, 126, 691 S.E.2d 453, 462 (2010). I agree that article X, section 13 of our constitution provides the necessary nexus between the General Assembly and membership on the Bank's Board of Directors. It is this constitutional nexus between the legislative office and service on the Bank's Board of Directors that, in my judgment, provides an objective framework and requires this Court to reject Petitioners' constitutional dual-office holding challenge.

Because the constitution is controlling, I would not adopt a framework that would have the effect of upholding a legislative enactment that purports to shield a member of the General Assembly from the dual-office holding prohibitions. Similarly, I agree with the majority that a dual-office holding claim is not resolved by considerations of degrees of board or commission membership, such as minority representation. Rather, the issue posed is straightforward—it is either a constitutionally prohibited dual office or it is not. That is precisely why we explained in *Segars–Andrews* that "because the Legislature is impressed by our constitution with sole responsibility for the election and re-election of judges[,] . . . service on the [Judicial Merit Selection Commission] by one

who holds an office in the executive or judicial branch would violate the constitutional ban on dual-office holding." 387 S.C. at 126, 691 S.E.2d at 462. It is the presence or absence of the *constitutional* nexus, and nothing more, that should answer the dual-office holding question.

In light of the South Carolina Constitution of 1895, I also join the majority in rejecting Petitioners' separation of powers claim. I commend Justice Hearn for her excellent recitation of the importance of the separation of powers doctrine in our country's founding. This Court's jurisprudence often recognizes, in glowing terms, the sanctity of the separation of powers doctrine in our democratic republic. *See State ex rel. McLeod v. McInnis,* 278 S.C. 307, 312, 295 S.E.2d 633, 636 (1982) (observing that the separation of the branches of government "prevents the concentration of power in the hands of too few, and provides a system of checks and balances"); *State ex rel. McLeod v. Yonce,* 274 S.C. 81, 84, 261 S.E.2d 303, 305 (1979) (holding that under separation of powers the "legislative department makes the laws; the executive department carries the laws into effect, and the judicial department interprets and declares the laws").

Yet, as the majority articulates, "South Carolina … is somewhat singular in the extensive involvement of the legislature in the powers of the executive and judiciary." The majority further refers to South Carolina's "collaborative governance where the General Assembly wields extensive power." The majority is entirely correct to acknowledge the legislative dominance that prevails under the South Carolina Constitution of 1895. While article I, section 8 of our constitution contains the familiar separation of powers provision, the balance of the constitution is replete with provisions expressly granting broad powers to the legislative branch. It is for this reason that I believe, under our unique constitutional structure, a separation of powers challenge under article I, section 8 cannot be resolved by merely ascertaining whether the legislative branch is exercising an executive function. Here, the South Carolina Constitution expressly grants power to the legislature, such that legislative service on Bank's Board of Directors does not offend separation of powers.

TOAL, C.J., concurs.