593 S.E.2d 470

Edward D. SLOAN, Jr., individually, and as a Citizen, Resident, Taxpayer and Registered Elector of South Carolina, and on behalf of all others similarly situated, Petitioner,

v.

Marshall Clement SANFORD, Jr., Respondent.

No. 25783.

Supreme Court of South Carolina.

Heard Dec. 3, 2003.

Decided Feb. 9, 2004.

Rehearing Denied March 18, 2004.

432

James G. Carpenter and Jennifer J. Miller, of The Carpenter Law Firm, PC, of Greenville, for petitioner.

Henry J. White and Swati S. Patel, both of the Office of the Governor; Vance J. Bettis and Shahin Vafai, of Gignilliat, Savitz & Bettis, L.L.P., all of Columbia, for respondent.

Justice BURNETT:

Petitioner, Edward D. Sloan, brings this action in the Court's original jurisdiction against the Honorable Marshall Clement Sanford, Jr., Governor of South Carolina. Petitioner argues that because Governor Sanford holds a Commission under the Government of the United States as an officer in the Reserve of the Air Force, he does not meet the qualifications for Governor set forth in the South Carolina Constitution, Article IV, Section 2. Petitioner requests we issue a declaratory judgment holding Governor Sanford ineligible to serve as Governor because he holds a commission from the United States. For the following reasons, we decline to so rule.

### Factual Background

On January 22, 2002, Governor Sanford was tendered an indefinite term appointment as a Reserve of the Air Force in the grade of First Lieutenant, Medical Service Corps. On January 30, 2002, Governor Sanford signed an Oath of Office to serve as a commissioned officer in the Air Force Reserve. Approximately one year later, on January 15, 2003, Governor Sanford was sworn in as Governor of South Carolina.

### Issues

I. Does petitioner have standing to challenge respondent's eligibility to serve as South Carolina's governor?

II. Is Governor Sanford's holding of a commission in the Air Force Reserve consistent with the eligibility requirements to be governor as set forth in the South Carolina Constitution?

### I.

Petitioner contends he has standing to bring this action as a citizen, resident, taxpayer, and registered elector of the State of South Carolina. We agree.

434

As a general rule, to have standing, a litigant must have a personal stake in the subject matter of the litigation. *Glaze v. Grooms,* 324 S.C. 249, 478 S.E.2d 841 (1996). Additionally, a private person may not invoke the judicial power to determine the validity of executive or legislative action unless he has sustained, or is in immediate danger, of sustaining prejudice therefrom. *Blandon v. Coleman,* 285 S.C. 472, 330 S.E.2d 298 (1985).

In *Culbertson v. Blatt,* 194 S.C. 105, 9 S.E.2d 218 (1940), we held a plaintiff, suing in his capacity as a citizen and taxpayer, lacked standing to bring an action against several dual office-holding public officials. Since this Court's ruling in *Culbertson,* we have recognized, under certain circumstances, standing may be conferred upon a party when an issue is of such public importance as to require its resolution for future guidance. *Evins v. Richland County Historic Preservation Comm'n,* 341 S.C. 15, 532 S.E.2d 876 (2000); *Baird v. Charleston County,* 333 S.C. 519, 511 S.E.2d 69 (1999) (citing *Thompson v. South Carolina Comm'n on Alcohol & Drug Abuse,* 267 S.C. 463, 229 S.E.2d 718 (1976)). An appropriate balance between the competing policy concerns underlying the issue of standing must be realized. Citizens must be afforded access to the judicial process to address alleged injustices. On the other hand, standing cannot be granted to every individual who has a grievance against a public official. Otherwise, public officials would be subject to numerous lawsuits at the expense of both judicial economy and the freedom from frivolous lawsuits.

We conclude Petitioner has public interest standing because of the importance of the issue he raises. Our conclusion is consistent with prior case law. In *Baird, supra,* doctors sued Charleston County to enjoin the issuance of tax-exempt bonds to the Medical University of South Carolina (MUSC) for its purchase of St. Francis Hospital. We held the issuance of the hospital bonds clearly impacts a profound public interest, the public health and welfare. The eligibility of South Carolina's governor to serve in this State's highest elected office is at least as important as the proper funding for a clinical hospital for MUSC. Accordingly, we confer standing.

## II.

■ Petitioner contends Governor Sanford's holding of a commission in the Air Force Reserve is inconsistent with the eligibility requirements to serve as Governor as set forth in the South Carolina Constitution. We disagree.

The last sentence of Article IV, Section 2 of the South Carolina Constitution provides:

No person while Governor shall hold any office or other Commission (except in the militia) under the authority of this State, or of any other power.[1]

The "militia" exception of Article IV, Section 2 includes within its ambit Governor Sanford's service in the Air Force Reserve, thereby rendering his military commitment consistent with the South Carolina Constitution. For the following reasons, we conclude Article IV, Section 2 of the South Carolina Constitution permits the Governor to serve in the military reserves.

First, an historical analysis of the South Carolina "militia" reveals the term refers to a fighting force of citizen-soldiers, as distinguished from, professional soldiers. The concept of the militia as consisting of a force of armed citizens, available to serve in times of emergencies, dates back at least as far as the rule of King Alfred the Great. In varying degrees, the English model of the militia was transported to North America with the settlement of the New World. In the first decade of settlement, the South Carolina militia was called upon to make incursions against foreign enemies. Later in the colonial period, the militia served primarily as a local defense force. *See* Theodore Harry Jabbs, The South Carolina Colonial Militia 1663–1733 (1973) (unpublished Ph.D. dissertation, University of North Carolina) (on file with South Caroliniana Library).

In the Antebellum years, the "militia" continued to consist of citizen-soldiers, called out in times of emergency, to quash insurrection or protect against invasion. The federal Uniform Militia Act of 1792, and enabling legislation passed by South Carolina's General Assembly, required most male citizens to

---

1. The Constitution of 1778 and all subsequent South Carolina Constitutions have contained a similar provision.

serve in the state militia. While membership was required in the "line" militia, some of these citizen-soldiers, formed semi-autonomous volunteer companies. *See* Michael Stauffer, *Volunteer or Uniformed Companies in the Antebellum Militia: A Checklist of Identified Companies, 1790–1859*, 88 South Carolina Historical Magazine 108 (Jan.1987).

The tradition of the volunteer component of the "militia" continues today. The framers of the 1778 Constitution could not have specifically envisioned the "militia" would consist of the Air Force Reserve, which was officially designated in 1948. However, like the militias of yesteryear, the Air Force Reserve consists of citizen-soldiers, who serve primarily on a part-time basis and who can be called up to serve full time in emergencies. We believe the history of the South Carolina militia, a fighting force, which has consisted of the citizen-soldier, encompasses the Air Force Reserve and supports our finding Governor Sanford's part-time military service is consistent with the South Carolina Constitution.

■ Second, a principal purpose of Article IV, Section 2 is to ensure the separation of powers of the three branches of government, that is, to keep the executive, judicial, and legislative branches of government separate. In 1969, a committee chaired by John C. West, presented a final report to then Governor McNair, after the committee analyzed each section of the State's Constitution. The minutes of the West Commission Committee meetings confirm the dual-office holding purpose of the provision.[2] *Proceedings of the Committee to Make a Study of the Constitution of South Carolina (1895)*, August 25, 1966—December 29, 1967 (Oct. 27, 1967) p. 66. Although certain qualifications for Governor are included within Article

---

2. The following discussion occurred:

> *Mr. Stoudemire* (staff consultant): All right. "No person while Governor shall hold any office or other commission except in the militia under authority of this State or any other power at one and the same."
> *Mr. West:* I think we can approve that and I think it's a good thing.
> *Mr. Stoudemire:* This is a standard dual office holding provision designed to prevent dual office holding.
> *Mr. West:* You know several states don't have that dual office holding.
> *Mr. Stoudemire:* Mr. Chairman, is that last sentence agreed to, then?
> *Mr. West:* It's agreed. Yes, sir.

IV, Section 2,[3] we do not believe these qualification provisions negate the dual-office holding purpose and underlying separation of powers rationale intended by the last sentence of Article IV, Section 2. Because Governor Sanford is not serving in two of the three branches of government by holding a commission in the Air Force Reserve, he is not holding dual offices as envisioned by the last sentence of Article IV, Section 2 and is not in violation of the South Carolina Constitution.[4]

Petitioner argues South Carolina has always required its Governor's singular, devoted attention to the office and the Governor's military service could impede the exercise of his gubernatorial duties. Although we agree South Carolina has always demanded its governor's loyalty, the historical context giving rise to what is now the last sentence of Article IV, Section 2 indicates the framers were more likely concerned the colonial governors' loyalties would lie with England and

---

3. Article IV, Section 2, contains, *inter alia,* age and residency requirements for the governor.

4. A number of courts interpreting dual-office holding clauses have held such clauses do not prohibit holders of state office from serving in the reserves or from being called upon to temporarily defend the country. *See McCoy v. Board of Supervisors of Los Angeles County,* 18 Cal.2d 193, 114 P.2d 569 (1941) (the chief engineer of a California county could also serve as a major in the Marine Corps Reserve); *In re Advisory Opinion to the Governor,* 150 Fla. 556, 8 So.2d 26 (1942) (the induction of a sheriff into the United States Army does not disqualify the sheriff from office); *Baker v. Dixon,* 295 Ky. 279, 174 S.W.2d 410 (1943) (the Commonwealth's Attorney was not disqualified from office due to his service in the Army); *In re Opinion of the Justices,* 307 Mass. 613, 29 N.E.2d 738 (1940) (a superior court judge's position as a member of a local or an appeal board created by the Federal Selective Training and Service Act were not incompatible); *State ex rel. McGaughey v. Grayston,* 349 Mo. 700, 163 S.W.2d 335 (1942) (the constitutional prohibition against the holding of an office or profit under the United States and under the state does not apply to disqualify a circuit judge from service); *In re Advisory Opinion to the Governor,* 223 N.C. 845, 28 S.E.2d 567 (1944) (the Governor of North Carolina could grant the Comptroller of State Board of Education a leave of absence while serving as a captain in the United States Army, without vacating his civil office); *Critchlow v. Monson,* 102 Utah 378, 131 P.2d 794 (1942) (a state supreme court justice was not required to vacate his position due to temporary military obligations); *State ex rel. Thomas v. Wysong,* 125 W.Va. 369, 24 S.E.2d 463 (1943) (a Captain in the United States Army could also serve as Attorney General).

not with South Carolina.[5]

The framers of South Carolina's early constitutions minimized the governor's potential corruption and disloyalty to the State by preventing dual office holding on the part of the Governor. However, the framers, realizing temporary military service would not subvert the governors' obligations to the State, did not restrict such service by the governors. Likewise, we do not believe the Governor's service in the Air Force Reserve today impinges on his allegiance to South Carolina.

■ Third, state and federal policy support the performance of military service by citizens. The policy favoring military service by citizens is evidenced in both state and federal legislation.[6] South Carolina Code Ann. § 8–7–30 (1986) provides "[t]he absence of any officer from his office or position caused by his being in the military service shall not create a forfeiture of or vacancy in the office or position to which such officer was elected or appointed...." In the absence of a clear intent on the part of our Constitution's

---

5. In March of 1776, South Carolina became the first southern colony and the second of the thirteen to draft a state constitution. Walter Edgar, *South Carolina A History*, 226 (Univ. of South Carolina Press 1998). Although the 1776 Constitution did not contain the provision addressing the governor's service in the militia, the preamble of the 1776 Constitution lends insight into the historical context under which the framers of the 1778 Constitution were working. The preamble provides, in part:

And whereas, instead of obtaining that justice, to which the Colonists were and are of right entitled, the unnatural civil war into which they were thus precipitated and are involved, hath been prosecuted with unremitted violence, and the Governors and others bearing the royal commission in the colonies have broken the most solemn promises and engagements, and violated every obligation of honor, justice and humanity, have caused the persons of divers good people to be seized and imprisoned, and their properties forcibly taken and detained, or destroyed, without any crime or forfeiture....

Additionally, Article XXXVI of the 1778 Constitution required all persons in positions of trust to take an oath acknowledging South Carolina as a free and sovereign state, and renouncing any allegiance to King George III.

6. The federal Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. §§ 4301–4333, prohibits discrimination or acts of reprisal against an employee based on the employee's military service.

framers to exclude the Governor from military service as a citizen-soldier, we decline to penalize him for his efforts.

We, therefore, conclude Governor Sanford's service in the Air Force Reserve is consistent with Article IV, Section 2 of the South Carolina Constitution.

TOAL, C.J., MOORE, WALLER, and PLEICONES, JJ., concur.