# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

James Jefferson Jowers Sr., Andrew J. Anastos, Ben Williamson, Melanie Ruhlman, and Anthony Ruhlman, Appellants,

v.

South Carolina Department of Health and Environmental Control, Respondent.

Appellate Case No. 2016-000428

Appeal from Barnwell County
R. Markley Dennis Jr., Circuit Court Judge

Opinion No. 27725
Heard January 11, 2018 – Refiled May 30, 2018

**AFFIRMED**

Amy E. Armstrong, Amelia A. Thompson, and Jessie A. White, all of South Carolina Environmental Law Project, of Pawleys Island, for Appellants.

Attorney General Alan McCrory Wilson, Solicitor General Robert D. Cook, Deputy Solicitor General J. Emory Smith Jr., Senior Assistant Attorney General T. Parkin C. Hunter, Assistant General Counsel Michael S. Traynham, all of Columbia and Lisa A. Reynolds, of Anderson, Reynolds & Stephens, LLC, of Charleston, for Respondent.

M. McMullen Taylor, of Mullen Taylor, LLC, of Columbia and John D. Echeverria, of Vermont School of Law, South Royalton, Vermont, for Amicus Curiae, Congaree Riverkeeper, Inc.

**JUSTICE FEW:** This is a challenge to the registration provisions in the Surface Water Withdrawal Act. The plaintiffs claim those provisions are an unconstitutional taking, a violation of due process, and a violation of the public trust doctrine. The circuit court granted summary judgment against the plaintiffs on the grounds the case does not present a justiciable controversy, both because the plaintiffs lack standing and the dispute is not ripe for judicial determination. We affirm.

We originally decided this case in an opinion filed July 19, 2017. *Jowers v. S.C. Dep't of Health & Envtl. Control*, Op. No. 27725 (S.C. Sup. Ct. filed July 19, 2017) (Shearouse Adv. Sh. No. 27 at 28). The plaintiffs filed a petition for rehearing as to our ruling that their claims for a violation of the public trust doctrine do not present a justiciable controversy. Neither side challenged our rulings that the plaintiffs' claims of an unconstitutional taking and a violation of due process are not justiciable, which were unanimous rulings. Therefore, we have not reconsidered those rulings, and we have repeated the explanation of them in section V of this opinion. We have reconsidered our ruling concerning the public trust claim, and we address that claim in section VI.

## I.      The Surface Water Withdrawal Act

The Surface Water Withdrawal, Permitting, Use, and Reporting Act regulates surface water withdrawals in South Carolina. S.C. Code Ann. §§ 49-4-10 to -180 (Supp. 2017). Surface water is defined as "all water that is wholly or partially within the State . . . or within its jurisdiction, which is open to the atmosphere and subject to surface runoff, including, but not limited to, lakes, streams, ponds, rivers, creeks, runs, springs, and reservoirs . . . ." § 49-4-20(27). The Department of Health and Environmental Control is charged with the implementation and enforcement of the Act. § 49-4-170. The Act establishes two mechanisms to regulate surface water withdrawals—a permitting system and a registration system.

### A.      Permitting System

The Act requires most "surface water withdrawers" to obtain a permit before withdrawing surface water. § 49-4-25. A "surface water withdrawer" is defined as "a person withdrawing surface water in excess of three million gallons during any one month . . . ." § 49-4-20(28). A permit applicant must provide detailed information to DHEC about the proposed surface water withdrawal. § 49-4-80(A). DHEC must provide the public with notice of a permit application within thirty days,

and if residents of the affected area request a hearing, DHEC must conduct one. § 49-4-80(K)(1). If DHEC determines the proposed use is reasonable, DHEC must issue a permit to the applicant. §§ 49-4-25, -80(J). In making its determination of reasonableness, DHEC is required to consider a number of criteria. § 49-4-80(B).[1] Permits are issued for a term of no less than twenty years and no more than fifty years. § 49-4-100(B). After a permit is issued, surface water withdrawals made pursuant to the terms and conditions of the permit are presumed to be reasonable. § 49-4-110(B).

### B.    Registration System

Agricultural users are treated differently under the Act. "[A] person who makes surface water withdrawals for agricultural uses[2] at an agricultural facility[3]" is classified as a "Registered surface water withdrawer," § 49-4-20(23), and is not required to obtain a permit, § 49-4-35(A).[4] Instead, agricultural users simply register their surface water use with DHEC and are permitted to withdraw surface water up to the registered amount. § 49-4-35(A). Because agricultural users are exempt from

---

[1] Subsection 49-4-80(B) sets forth the criteria for determining reasonableness: (1) minimum instream flow or minimum water level and the safe yield; (2) anticipated effect of the proposed use on existing users; (3) reasonably foreseeable future need for surface water; (4) reasonably foreseeable detrimental impact on navigation, fish and wildlife habitat, or recreation; (5) applicant's reasonably foreseeable future water needs; (6) beneficial impact on the State; (7) impact of applicable industry standards on the efficient use of water; (8) anticipated effect of the proposed use on: (a) interstate and intrastate water use; (b) public health and welfare; (c) economic development and the economy of the State; and (d) federal laws and interstate agreements and compacts; and (9) any other reasonable criteria DHEC promulgates by regulation. § 49-4-80.

[2] "Agricultural use" is defined broadly to include the preparation, production, and sale of crops, flowers, trees, turf, and animals. § 49-4-20(3).

[3] "Agricultural facility" is also defined broadly. § 49-4-20(2).

[4] As section 49-4-25 indicates, there are other exceptions to the permit requirement "provided in Sections 49-4-30, 49-4-35, 49-4-40, and 49-4-45." The exception for agricultural users is provided in section 49-4-35.

the permit requirement, their surface water use is not subject to the subsection 49-4-80(B) reasonableness factors.

The Act establishes two ways for agricultural users to register their water use with DHEC—one for users who were already reporting their use to DHEC when the Act was rewritten in 2010,[5] and one for users who were not yet reporting their use. For those already reporting, the Act allows the user to "maintain its withdrawals at its highest reported level or at the design capacity of the intake structure" and the user is deemed registered. § 49-4-35(B). For users who were not yet reporting their use, the Act requires the user to report its anticipated withdrawal amount to DHEC for DHEC to determine whether the use is within the "safe yield" of the water source. § 49-4-35(C). Safe yield is defined as,

> [T]he amount of water available for withdrawal from a particular surface water source in excess of the minimum instream flow or minimum water level for that surface water source. Safe yield is determined by comparing the natural and artificial replenishment of the surface water to the existing or planned consumptive and nonconsumptive uses.

§ 49-4-20(25). After DHEC determines whether the anticipated withdrawal amount is within the safe yield, it "must send a detailed description of its determination to the proposed registered surface water withdrawer." § 49-4-35(C).

The Act grants DHEC oversight over registered withdrawals. Subsection 49-4-35(E) provides,

> The department may modify the amount an existing registered surface water withdrawer may withdraw, or suspend or revoke a registered surface water withdrawer's authority to withdraw water, if the registered surface water withdrawer withdraws substantially more surface water

---

[5] The Water Use Reporting and Coordination Act was originally enacted in 1982, Act No. 282, 1982 S.C. Acts 1980. It was completely rewritten in 2010 and renamed the Surface Water Withdrawal, Permitting, Use, and Reporting Act, Act No. 247, 2010 S.C. Acts 1824-49. The 1982 Act provided for a regulatory "reporting system for agricultural users." 1982 S.C. Acts at 1982.

than he is registered for or anticipates withdrawing, as the case may be, and the withdrawals result in detrimental effects to the environment or human health.

§ 49-4-35(E).

Registration has three effects important to the plaintiffs' claims in this case. First, unlike permits, which are issued for a term of years, registrations have no time limits. *Compare* § 49-4-35(C) (allowing registered users to continue making withdrawals "during subsequent years" with no reference to time limits), *with* § 49-4-100(B) (establishing time limits for permits). Second, the Act presumes all registered amounts are reasonable. § 49-4-110(B). Third, the Act changes the elements for a private cause of action for damages by requiring plaintiffs to show a registered user is violating its registration. *Id.*

## II.     Procedural History

The plaintiffs own property along rivers or streams in Bamberg, Darlington, and Greenville counties. In September 2014, they jointly filed this action against DHEC in Barnwell County, challenging the Act's registration system for agricultural users in three ways. First, they claim the registration system is an unconstitutional taking of private property for private use. *See* S.C. CONST. art. I, § 13(A) ("private property shall not be taken for private use"). Second, they claim the Act violates their due process rights by depriving them of their property without notice or an opportunity to be heard. *See* U.S. CONST. amend. XIV, § 1 ("No state shall . . . deprive any person of . . . property, without due process of law . . . ."); S.C. CONST. art. I, § 3 ("nor shall any person be deprived of . . . property without due process of law"). Finally, they claim the Act violates the public trust doctrine by disposing of assets the State holds in trust. *See* S.C. CONST. art. XIV, § 4 ("All navigable waters shall forever remain public highways free to the citizens of the State . . . ."); *Sierra Club v. Kiawah Resort Assocs.*, 318 S.C. 119, 128, 456 S.E.2d 397, 402 (1995) (stating "the state owns the property below . . . a navigable stream . . . [as] part of the Public Trust").

The plaintiffs and DHEC filed motions for summary judgment. The circuit court granted summary judgment in favor of DHEC after finding the plaintiffs did not have standing and the case was not ripe. The circuit court also addressed the merits of the plaintiffs' claims. The court ruled the Act's registration process was not an unconstitutional taking because the plaintiffs were not deprived of any rights. Likewise, the circuit court held that without a deprivation of rights, there could be

no violation of due process. The circuit court held the public trust doctrine was not violated because the plaintiffs had not lost their right to use the waterways or been injured by any withdrawals. The circuit court did not rule on DHEC's contention the claims were barred by the statute of limitations or that venue was improper.

The plaintiffs appealed to the court of appeals and moved to certify the case to this Court pursuant to Rule 204(b) of the South Carolina Appellate Court Rules. We granted the motion to certify.

## III. Justiciability

Our courts will not address the merits of any case unless it presents a justiciable controversy. *Byrd v. Irmo High Sch.*, 321 S.C. 426, 430-31, 468 S.E.2d 861, 864 (1996). In *Byrd*, we stated, "Before any action can be maintained, there must exist a justiciable controversy," and, "This Court will not . . . make an adjudication where there remains no actual controversy." *Id.*; *see also Peoples Fed. Sav. & Loan Ass'n v. Res. Planning Corp.*, 358 S.C. 460, 477, 596 S.E.2d 51, 60 (2004) ("A threshold inquiry for any court is a determination of justiciability, i.e., whether the litigation presents an active case or controversy."). "Justiciability encompasses . . . ripeness . . . and standing." *James v. Anne's Inc.*, 390 S.C. 188, 193, 701 S.E.2d 730, 732 (2010). Standing is "a personal stake in the subject matter of the lawsuit." *Sea Pines Ass'n for Prot. of Wildlife, Inc. v. S.C. Dep't of Nat. Res.*, 345 S.C. 594, 600, 550 S.E.2d 287, 291 (2001). A plaintiff has standing to challenge legislation when he sustained, or is in immediate danger of sustaining, actual prejudice or injury from the legislative action. 345 S.C. at 600-01, 550 S.E.2d at 291. To meet the "stringent" test for standing, "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" 345 S.C. at 601, 550 S.E.2d at 291 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351, 364 (1992)).[6] We have explained ripeness by defining what is not ripe, stating "an issue that is contingent, hypothetical, or abstract is not ripe for judicial review." *Colleton Cty. Taxpayers Ass'n v. Sch. Dist. of Colleton Cty.*, 371 S.C. 224, 242, 638 S.E.2d 685, 694 (2006).

Before we may determine whether the plaintiffs have presented a justiciable controversy, we must first understand their theory of how the Act has caused them

---

[6] A plaintiff must show two additional elements not at issue in this case: causation and likelihood the injury can be redressed by the court's decision. *Id.*

injury.  Because their theory depends on their interpretation of the Act, we must then interpret the Act to determine whether they have properly alleged an "injury in fact" under it, *Sea Pines*, 345 S.C. at 601, 550 S.E.2d at 291, such that this case presents an "actual controversy" as opposed to one that is "contingent, hypothetical, or abstract," *Byrd*, 321 S.C. at 431, 468 S.E.2d at 864; *Colleton Cty.*, 371 S.C. at 242, 638 S.E.2d at 694.

We review de novo the circuit court's ruling that there is no justiciable controversy. *See Ex parte State ex rel. Wilson*, 391 S.C. 565, 570, 707 S.E.2d 402, 405 (2011) (affirming the circuit court's order granting summary judgment on the basis of justiciability where the ruling depended on statutory interpretation, and stating, "The construction of a statute is a question of law, which this Court may resolve without deference to the circuit court.").

## IV.    The Plaintiffs' Theory of Injury

The plaintiffs' claims of unconstitutional taking and violation of due process are based on their allegation the Act has deprived them of "riparian" rights.  The public trust claim, on the other hand, is based on the allegation the Act disposes of assets the State holds in trust for our citizens.

### A.    Riparian Rights

The property rights the plaintiffs allege have been taken from them under the registration provisions of the Act are known under the common law as riparian rights.  The word riparian means "pertaining to or situated on the bank of a river, or a stream."  78 Am. Jur. 2d *Waters* § 33 (2013).  *See also Riparian*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("Of, relating to, or located on the bank of a river or stream").[7]  Under the common law, riparian property owners—those owning land

---

[7] The current editions of *American Jurisprudence* and *Black's Law Dictionary* recognize that some states include lakes and tidal waters within the definition of riparian.  That is not true in South Carolina.  In *Lowcountry Open Land Trust v. State*, 347 S.C. 96, 552 S.E.2d 778 (Ct. App. 2001), our court of appeals held "interests attached to property abutting an ocean, sea or lake are termed 'littoral.'" 347 S.C. at 108, 552 S.E.2d at 785 (citing *Littoral*, BLACK'S LAW DICTIONARY (6th ed. 1990)); *see also White's Mill Colony, Inc. v. Williams*, 363 S.C. 117, 129, 609 S.E.2d 811, 817-18 (Ct. App. 2005) (stating "there is a distinction in classification that our courts have indicated a desire to strictly observe: owners of land along rivers

adjacent to rivers or streams—hold special rights allowing them to make "reasonable use" of the water adjacent to their property. *White's Mill Colony, Inc. v. Williams*, 363 S.C. 117, 129, 609 S.E.2d 811, 817 (Ct. App. 2005) (citing *Lowe v. Ottaray Mills*, 93 S.C. 420, 423, 77 S.E. 135, 136 (1913)). We have described "reasonable use" as follows,

> All that the law requires of the party, by or over whose land a stream passes, is, that he should use the water in a reasonable manner, and so as not to destroy, or render useless, or materially diminish, or affect, the application of the water by the proprietor below on the stream . . . .

*White v. Whitney Mfg. Co.*, 60 S.C. 254, 266, 38 S.E. 456, 460 (1901); *see also Mason v. Apalache Mills*, 81 S.C. 554, 559, 62 S.E. 399, 401 (1908) ("The different owners of land through which a stream flows are each entitled to the reasonable use of the water, and for an injury to one owner, incidental to the reasonable use of the stream by another, there is no right of redress.").

Thus, the right of reasonable use is "subject to the limitation that the use may not interfere with the like rights of those above, below, or on the opposite shore." *White's Mill Colony, Inc.*, 363 S.C. at 129, 609 S.E.2d at 817 (citing *Mason*, 81 S.C. at 559, 62 S.E. at 401). Under the common law, if a riparian owner unreasonably interferes with another riparian owner's right of reasonable use, the injured owner's remedy is to bring an action for damages, or for an injunction, or both. *See McMahan v. Walhalla Light & Power Co.*, 102 S.C. 57, 59-61, 86 S.E. 194, 194-95 (1915) (approving a jury charge on the right of reasonable use in a case where a downstream riparian owner sued an upstream riparian owner for damages); *Mason*, 81 S.C. at 557, 62 S.E. at 400 (describing the downstream riparian owner's claim for an injunction against the upstream operator of a dam based on "the unreasonable use of the stream"); *see also* 78 Am. Jur. 2d *Waters* § 53 (2013) ("Interference with riparian rights is an actionable tort. Any interference with a vested right to the use of water . . . would entitle the party injured to damages, and an injunction would issue perpetually restraining any such interference.").

## B. Public Trust Assets

---

and streams are said to hold 'riparian' rights, while owners of land abutting oceans, seas, or lakes, are said to hold 'littoral' rights").

The Constitution of South Carolina provides, "All navigable waters shall forever remain public highways free to the citizens of the State and the United States." S.C. CONST. art. XIV, § 4. Consistent with this provision, the State owns all property below the high water mark of any navigable stream. *Sierra Club*, 318 S.C. at 128, 456 S.E.2d at 402; *see also McCullough v. Wall*, 38 S.C.L. (4 Rich.) 68, 87 (1850) (stating "in this State all rivers navigable for boats are *juris publici*[8]"). Courts have long recognized this ownership as a trust. In 1884, this Court held:

> The state had in the beds of these tidal channels not only title as property, . . . but something more, the *jus publicum*,[9] consisting of the rights, powers, and privileges . . . which she held in a fiduciary capacity for general and public use; in trust for the benefit of all the citizens of the state, and in respect to which she had trust duties to perform.

*State v. Pac. Guano Co.*, 22 S.C. 50, 83-84 (1884); *see also Illinois Cent. R. Co. v. State of Illinois*, 146 U.S. 387, 452-53, 13 S. Ct. 110, 118, 36 L. Ed. 1018, 1042 (1892) (recognizing this ownership as a "trust which requires the government of the state to preserve such waters for the use of the public").

We now call this the "public trust doctrine." *See Sierra Club*, 318 S.C. at 127-28, 456 S.E.2d at 402 (discussing "the Public Trust Doctrine"). Under the public trust doctrine, the State "cannot permit activity that substantially impairs the public interest in marine life, water quality, or public access." *McQueen v. S.C. Coastal Council*, 354 S.C. 142, 149, 580 S.E.2d 116, 119-20 (2003).[10] The plaintiffs argue

---

[8] *See Juris Publici*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("Of public right; relating to common or public use").

[9] *See Jus Publicum*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("The right, title, or dominion of public ownership; esp., the government's right to own real property in trust for the public benefit").

[10] In *Sierra Club,* to explain the general nature of the public trust doctrine, we quoted an expansive statement from an article in the Tulane Environmental Law Journal as to the scope of the doctrine. 318 S.C. at 127-28, 456 S.E.2d at 402. However, the permit applicant in *Sierra Club* never intended to consume the water itself, and we therefore confined our actual ruling to the permit's impact on the waterway: "marine life, water quality, or public access." 318 S.C. at 128, 456 S.E.2d at 402. While the

the Act violates the public trust doctrine by disposing of the State's water to agricultural users. According to the plaintiffs, "the State has lost complete control of registered amounts of water in perpetuity."

Having explained the plaintiffs' theory of injury, we turn now to the registration provisions of the Act to determine whether the terms of the Act support the plaintiffs' allegation of an injury in fact such that this case presents an actual controversy.

## V.     The Takings and Due Process Claims

The plaintiffs' takings and due process claims are based on their allegation that they have lost their riparian right to bring a challenge to another riparian owner's future unreasonable use. Significantly, the plaintiffs do not allege they have sustained any injury resulting from any withdrawal of surface water that has already been made by an agricultural user.[11] The allegation the plaintiffs do make is based on two provisions of the Act: (1) subsection 49-4-110(B), which states registered withdrawals are presumed to be reasonable and changes the elements for a private cause of action for damages, and (2) subsection 49-4-100(B), which requires permits must be issued for a specific term, but is silent as to time limits for registered uses. The plaintiffs argue these provisions allow registered users to withdraw a fixed amount of water that will forever be deemed reasonable, which in turn prevents them from ever successfully challenging a registered agricultural use, regardless of how conditions may change in the future. Based on this argument, the plaintiffs allege their "rights were fundamentally altered" the moment these provisions were signed into law,[12] and thus they have suffered an "injury in fact" sufficient to establish standing, and have presented an actual controversy that is ripe for judicial determination.

---

expansive statement we quoted was useful in conveying the general nature of the public trust doctrine, any portion of the statement that goes beyond the doctrine's applicability to "marine life, water quality, or public access" was not necessary to our decision, and is therefore dictum.

[11] In response to a discovery request, the plaintiffs admitted "[their] property and [their] use thereof have not been injured due to any withdrawal of water for agricultural purposes occurring on a river or stream flowing past property that [they] own."

[12] The rewritten Act became effective on January 1, 2011. 2010 S.C. Acts at 1848.

We find the Act does not support the plaintiffs' allegations of injury. First, we find nothing in the Act preventing the plaintiffs from seeking an injunction against a riparian owner for unreasonable use. Prior to the Act, a riparian owner could bring an action challenging another riparian owner's unreasonable use and seeking an injunction. *See Mason*, 81 S.C. at 563, 558, 62 S.E. at 402, 400 (affirming the circuit court's order granting an injunction, as modified, against the upstream operator of a dam based on "the unreasonable use of the stream"). After the Act, a riparian owner may still challenge another riparian owner's use as unreasonable—including a registered agricultural user. If such a plaintiff can prove a registered agricultural use is unreasonably interfering with his right of reasonable use, and otherwise establish the elements for an injunction, then the plaintiff may be entitled to injunctive relief.

Second, we find nothing in the Act preventing a riparian owner from filing a declaratory judgment action to protect his right of reasonable use. Under section 15-53-20 of the South Carolina Code (2005), courts have the "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." A riparian owner may file a declaratory judgment action against registered agricultural users, and request the court declare their use unreasonable. While such a declaration may be of little value without an injunction, there is nothing in the Act preventing the plaintiff from including DHEC as a defendant. This, in turn, could trigger DHEC's right to modify the registration under subsection 49-4-35(E).

Third, we find nothing in the Act prohibiting private causes of action for damages against registered agricultural users. In fact, the Act specifically contemplates such actions. Subsection 49-4-110(B) states, "No private cause of action for damages arising directly from a surface water withdrawal by a permitted or registered surface water withdrawer may be maintained *unless* the plaintiff can show a violation of a valid permit or registration." § 49-4-110(B) (emphasis added). While this provision changes the elements a plaintiff must prove in an action for damages, the right of action clearly still exists. In other words, if a plaintiff proves "a violation of a valid permit or registration," then the plaintiff may maintain a private right of action for damages. We are aware of no authority—and the plaintiffs cite none—for a finding that a change to the elements a plaintiff must prove in an action for damages deprives a future plaintiff of property rights under the takings or due process clauses.

Finally, we find no support in the Act for the plaintiffs' argument that the presumption of reasonableness will prevent future plaintiffs from proving a registered use is unreasonable. Under the common law, the plaintiff has the burden of proving—by a preponderance of the evidence—a defendant's use is unreasonable.

The Act, however, provides, "Surface water withdrawals made by permitted or registered surface water withdrawers shall be presumed to be reasonable." § 49-4-110(B). The Act is unclear whether the presumption is rebuttable or conclusive.[13] Employing the rules of statutory construction, we find the presumption is rebuttable.[14] Therefore, under the Act, a plaintiff may still meet his burden by proving—by a preponderance of the evidence—the defendant's use is unreasonable.

In summary, the plaintiffs' allegations that the Act has deprived them of their common law riparian rights are not supported by the terms of the Act. The plaintiffs may still challenge an agricultural use as unreasonable, they are still entitled to injunctive relief when they prove the required elements, and they may still recover damages when they prove the required elements. Because the Act has not deprived the plaintiffs of their riparian rights, they have no standing, and their claim for future injury is not ripe for our determination.

---

[13] A rebuttable presumption is defined as an "inference drawn from certain facts that establish a prima facie case, which may be overcome by the introduction of contrary evidence." *Rebuttable Presumption*, BLACK'S LAW DICTIONARY (10th ed. 2014). A conclusive presumption is defined as a "presumption that cannot be overcome by any additional evidence or argument because it is accepted as irrefutable proof that establishes a fact beyond dispute." *Conclusive Presumption*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[14] The presumption of reasonableness is found in the first sentence of subsection 49-4-110(B). The next sentence specifically contemplates a right of action for damages, "No private cause of action for damages . . . from a surface water withdrawal . . . may be maintained *unless* the plaintiff can show a violation of a valid permit or registration." § 49-4-110(B) (emphasis added). If we interpreted the presumption in the first sentence as conclusive, it would prevent any right of action for damages, and thus the first sentence would be in conflict with the second sentence. "[S]tatutes must be read as a whole and sections which are part of the same general statutory scheme must be construed together and each given effect, if it can be done by any reasonable construction." *Hudson ex rel. Hudson v. Lancaster Convalescent Ctr.*, 407 S.C. 112, 124-25, 754 S.E.2d 486, 492-93 (2014). "It is the duty of this Court to give all parts and provisions of a legislative enactment effect and reconcile conflicts if reasonably and logically possible." *Adams v. Clarendon Cty. Sch. Dist. No. 2*, 270 S.C. 266, 272, 241 S.E.2d 897, 900 (1978). Reading the presumption as rebuttable leaves no conflict.

The plaintiffs also argue they have standing under the public importance exception. "[S]tanding is not inflexible and standing may be conferred upon a party when an issue is of such public importance as to require its resolution for future guidance." *ATC S., Inc. v. Charleston Cty.*, 380 S.C. 191, 198, 669 S.E.2d 337, 341 (2008). However, we "must be cautious with this exception, lest it swallow the rule." *S.C. Pub. Interest Found. v. S.C. Transp. Infrastructure Bank*, 403 S.C. 640, 646, 744 S.E.2d 521, 524 (2013). We find the public importance exception does not apply to the plaintiffs' takings and due process claims in this case because there is no need for "future guidance."

## VI.    The Public Trust Claim

As we did with the plaintiffs' takings and due process claims, we begin our discussion of the public trust claim with the fact the plaintiffs do not allege that any public trust asset has been lost as a result of any withdrawal of surface water that has already been made by any agricultural user. *See supra* note 11. This fact alone ends the justiciability analysis for the public trust claim. *See Sea Pines*, 345 S.C. at 601, 550 S.E.2d at 291 (holding there must be an "injury in fact" for standing to exist); *Waters v. S.C. Land Res. Conservation Comm'n*, 321 S.C. 219, 228, 467 S.E.2d 913, 918 (1996) (holding a claim involving "'a threat of *possible* injury'" or "'the mere threat of potential injury'" is not ripe for judicial determination because it is "'too contingent or remote to support present adjudication'" (quoting *Thrifty Rent-A-Car Sys., Inc. v. Thrifty Auto Sales of Charleston, Inc.*, 849 F. Supp. 1083, 1086 (D.S.C. 1991))); *see also Thrifty Rent-A-Car*, 849 F. Supp. at 1085-86 (stating "a . . . court should not decide a controversy grounded in uncertain and contingent events that may not occur as anticipated or may not occur at all").

However, the plaintiffs advance a novel theory of justiciability based on their argument the Act "effectively dispose[s] of substantial, permanent rights in South Carolina's navigable waterways to agricultural users." They allege the State has "lost complete control of registered amounts of water in perpetuity" and the "registered owner has complete control over whether or not the State can ever alter the registered amount." According to the plaintiffs, the registration provisions create a "vested right" to use the registered amount in perpetuity, "without regard to reasonableness, future conditions, or future uses." Because the State "permanently transferred public trust property" to private registered users, the plaintiffs argue, they suffered an injury the moment the Act became law, despite the fact no public trust asset has yet been lost. In sum, the plaintiffs' theory of the justiciability of their public trust doctrine claim is based on the possibility that future surface water withdrawals might—depending on unknown future circumstances—endanger assets held in trust by the

State, and their argument that the Surface Water Withdrawal Act prohibits the State from protecting trust assets from that potential future loss.

Even under this theory, the plaintiffs have failed to present a justiciable controversy. First, as we have already explained, the theory depends on the possible occurrence of unknown future circumstances that might—or might not—cause the loss of trust assets. Claims that depend on contingent, future harm are not justiciable. *See Sea Pines*, 345 S.C. at 601, 550 S.E.2d at 291; *Waters*, 321 S.C. at 228, 467 S.E.2d at 918.

Second, this theory depends on the argument that the State has no ability to act to protect trust assets if circumstances arise in the future that make action necessary. This argument is wrong, most importantly because the State contends it does have the ability to act to protect trust assets. Therefore, the State—whom even the plaintiffs contend is the party responsible for protecting these assets—has given clear indication it stands ready and able to act to protect trust assets if and when the need to do so ever arises.

The State presents three specific mechanisms through which it may act to protect trust assets if and when it becomes necessary. One, the State asserts, "State officials could bring a common law action to challenge the Act as applied." Return to Petition for Rehearing, filed Aug. 24, 2017, at 4 (citing *Thompson v. S.C. Comm'n on Alcohol & Drug Abuse*, 267 S.C. 463, 229 S.E.2d 718 (1976)).[15] Two, the State asserts it could bring "a common law challenge to the reasonableness of the withdrawal." Return to Petition for Rehearing, filed Aug. 24, 2017, at 4. As we explained in detail above, nothing in the Act abolishes a riparian owner's common law right to bring an action that challenges another riparian owner's use as unreasonable. Likewise, nothing in the Act prevents the State from bringing a similar action to protect the assets it holds in trust.

The third mechanism presented by the State is the Drought Response Act, which allows the State to protect its interest in navigable streams during periods of drought. S.C. Code Ann. §§ 49-23-10 to -100 (2008 & Supp. 2017). Under the Drought Response Act, the Department of Natural Resources (DNR) has the duty to

---

[15] In *Thompson*, we allowed public officials to bring a declaratory judgment action to challenge legislation that prohibited counties and municipalities from adopting or enforcing laws that criminalized drinking alcohol. 267 S.C. at 467-68, 229 S.E.2d at 719-20.

"formulate, coordinate, and execute a drought mitigation plan," § 49-23-30, and has broad powers to protect the water in navigable streams against excessive consumption by surface water withdrawers, *e.g.*, § 49-23-50. These powers include the State's authority to prevent most registered agricultural users from withdrawing unreasonable amounts of water during periods of drought. § 49-23-70(C). Also, the Governor has the authority to declare a drought emergency and "issue emergency proclamations and emergency regulations to require curtailment of water withdrawals or to allocate water on an equitable basis." § 49-23-80. We agree with the State that it has the power to act to protect trust assets under each of these three mechanisms.

Not only does the State have the power to act, it also is under a duty to act. This action was brought against DHEC because it administers the Surface Water Withdrawal Act. However, DHEC's duties with regard to navigable streams are broader than administering this Act, and include the "obligations" that formerly belonged to the "Water Resources Commission regulatory division." S.C. Code Ann. § 1-30-45(D) (2005); *see also* S.C. Code Ann. § 49-3-30 (2008) ("The regulatory functions of the former Water Resources Commission are transferred to the Department of Health and Environmental Control."). Regulation 61-68—one of the regulations DHEC promulgated under that obligation—provides, "It is a goal of the Department to maintain and improve all surface waters to a level to provide for the survival and propagation of a balanced indigenous aquatic community of flora and fauna and to provide for recreation in and on the water." 6 S.C. Code Ann. Regs. 61-68 (Supp. 2017).

In addition to DHEC, other State agencies are under a duty to protect navigable streams. DNR is under a duty to enforce the Drought Response Act. *See supra* discussion of the Drought Response Act. DNR is also under a duty to enforce the Water Resources Planning and Coordination Act. S.C. Code Ann. §§ 49-3-10 to -50 (2008 & Supp. 2017). The Water Resources Planning and Coordination Act does not specifically enable DNR to bring a lawsuit, but the Drought Response Act does. *See* § 49-23-100. The Water Resources Planning and Coordination Act does, however, require DNR to coordinate with other agencies who do have the power to bring legal action. *See generally* § 49-3-40 (2008) (providing DNR with broad powers and duties to "advise and assist the Governor and the General Assembly" to establish water resource policy in South Carolina).

These duties are important in understanding the power of the State to enforce—when an actual dispute arises—article XIV, section 4 of the South Carolina Constitution, which provides, "All navigable waters shall forever remain public highways free to

the citizens of the State . . . ."  The State's duty to protect navigable streams is clear, and it may take the necessary action at the necessary time to fulfil that duty.  If some future registered user defendant takes the position the State cannot act, the courts can address it then.  Alternatively, if the State fails to take action sometime in the future if and when action is necessary, the plaintiffs could bring this same action and it would present a justiciable controversy.

The third reason the plaintiffs have failed to present a justiciable controversy even under their novel theory is that the theory depends on there being no changes to the law regarding surface water withdrawals between now and the occurrence of these unknown future circumstances.  One of the State's duties—through DNR—under the Water Resources Planning and Coordination Act is to "recommend[] to the General Assembly any changes of law required to implement the policy declared in this chapter."  § 49-3-40(a)(6).  Though the plaintiffs have not presented a justiciable controversy in this lawsuit, they have brought to the State's attention—and into public discussion—the dangers associated with the possibility of excessive surface water withdrawals by agricultural users in the future.  In the exercise of its duties in this regard, if the State determines it is advisable to amend the provisions of the Surface Water Withdrawal Act to protect against these dangers, it must make appropriate recommendations to the General Assembly to protect public trust assets.  Because there is no way to determine whether the Act will be amended between now and that point, this issue is not justiciable.  *Cf. Thompson v. State*, 415 S.C. 560, 566-67, 785 S.E.2d 189, 192 (2016) (declining to address the defendant's request for a declaratory judgment "because there is no way to determine whether the General Assembly will amend [the law in the future]," and therefore a declaration would be "purely advisory").

The final reason the plaintiff's novel theory of justiciability must fail is that the philosophical foundation of the plaintiff's public trust claim requires it.  The public trust doctrine provides that the State has the inherent authority to act to protect public trust assets.  *See Sierra Club*, 318 S.C. at 128, 456 S.E.2d at 402 (recognizing the State owns all property below the high water mark of any navigable stream).  This inherent authority *requires* the State to act if and when the need arises.  *See Pac. Guano Co.*, 22 S.C. at 83-84 (recognizing this ownership is "in trust for the benefit of all the citizens of the state, and in respect to which she had trust duties to perform"); *see also* § 1-30-45(D) (providing DHEC with "obligation" to perform "regulatory functions"); § 49-23-30 (providing DNR with duty to protect the State's water in drought conditions); § 49-3-40 (providing DNR with duty to recommend changes to the law when necessary).  If a situation ever arises in which public trust assets are actually being lost due to excessive surface water withdrawals, the very

nature of the public trust doctrine requires the State to act, and provides that it must prevail.

The plaintiffs argue the public importance exception should apply to their public trust claim because this issue is of such public importance as to require its resolution for future guidance. In *Sloan v. Sanford*, 357 S.C. 431, 434, 593 S.E.2d 470, 472 (2004), we explained that the decision of whether to apply the public importance exception to standing requires balancing two competing interests:

> An appropriate balance between the competing policy concerns underlying the issue of standing must be realized. Citizens must be afforded access to the judicial process to address alleged injustices. On the other hand, standing cannot be granted to every individual who has a grievance against a public official. Otherwise, public officials would be subject to numerous lawsuits at the expense of both judicial economy and the freedom from frivolous lawsuits.

357 S.C. at 434, 593 S.E.2d at 472.

The "alleged injustice" the plaintiffs seek to address in this case is that at some point in the future the State may fail to protect against currently nonexistent unreasonable uses of surface water, which in turn could become so severe that the State's inaction amounts to a violation of its responsibilities to protect the public trust. As we have explained, however, the State has a duty to attempt the necessary future action to protect against these hypothetical future unreasonable uses. Thus, the "Citizens must be afforded access to the judicial process" side of the *Sloan* balance carries very little weight. After weighing that factor against the other competing interests we described in *Sloan*, we find the public importance exception should not apply to the plaintiffs' public trust claim. As we stated earlier, courts "must be cautious with this exception, lest it swallow the rule." *S.C. Pub. Interest Found.*, 403 S.C. at 646, 744 S.E.2d at 524.[16]

---

[16] The dissent argues the plaintiffs' public trust claim should be remanded to the circuit court to allow the plaintiffs to fully develop the record "to determine the extent to which, if any, the Act has authorized activities that substantially impair the public interest in marine life, water quality, and public access." Not only does this position illustrate the plaintiffs' failure to prove any public trust asset has been lost as a result of water withdrawals, *see supra* note 11, it is also directly opposite of the position the plaintiffs have taken on the necessity of a remand. At oral argument

However, the plaintiffs' public importance exception argument must fail for an even more fundamental reason—the exception applies to standing, not ripeness. This point is illustrated by the plaintiffs' flawed reliance on a statement from our decision in *South Carolina Public Interest Foundation*. Relying on that decision, the plaintiffs argue the exception applies "to a party who has not suffered a particularized injury . . . ." *See* 403 S.C. at 645, 744 S.E.2d at 524. Our point in making the quoted statement, however, was that *somebody had* suffered an injury. In that case, the South Carolina Transportation Infrastructure Bank had expended nearly three billion dollars of taxpayer money on major transportation projects, 403 S.C. at 644, 744 S.E.2d at 523, with two legislators serving on the Board in violation of the Constitution's prohibition against dual office holding and the Constitution's provisions regarding the separation of powers, 403 S.C. at 646-48, 648-54, 744 S.E.2d at 524-25, 525-28. Thus, we stated, "The public importance exception *grants standing* to a party who has not suffered a particularized injury . . . ." 403 S.C. at 645, 744 S.E.2d at 524.

The "has not suffered a particularized injury" language does not remove the injury in fact requirement; instead, it simply allows someone who has not personally suffered an injury to step into the shoes of someone who has. *See ATC S., Inc.*, 380 S.C. at 198, 669 S.E.2d at 341 ("In cases which fall within the ambit of important public interest, standing will be conferred 'without requiring the plaintiff to show he has an interest greater than other potential plaintiffs.'") (quoting *Davis v. Richland Cnty. Council*, 372 S.C. 497, 500, 642 S.E.2d 740, 741 (2007))). In other words, the exception allows a substitution in place. Here, the plaintiffs seek not only a substitution in place, but also a substitution in time. They attempt to fast-forward to a point in time when there might be a loss of trust assets, if and when the State fails to protect those assets. The public importance exception does not apply to a lack of ripeness.[17]

---

before this Court, counsel for the plaintiffs stated, "This is a facial challenge; it is to the validity of the Act itself, and we don't believe there is any further factual information that needs to be developed because you are looking at what the Act does. . . . The Court can do that just by looking at the language of the Act itself."

[17] In addition to *South Carolina Public Interest Foundation*, the dissent references two additional cases it claims represent the "wide range of cases" where we have applied the public importance exception to standing. However, like *South Carolina Public Interest Foundation*, these cases involved only standing, not ripeness. *See Davis*, 372 S.C. at 500, 642 S.E.2d at 741-42 (granting public importance standing

The dissent argues, however, "the public trust violation itself is the alleged injury," and thus the claim is actually ripe. The argument does not accurately represent the plaintiffs' theory. The "public trust violation"—under the plaintiffs' theory—would be the future loss of water, not the 2010 Act. The injury—under the plaintiffs' theory—is an existing inability to challenge a future loss of water, an inability created by the 2010 Act. Thus, the plaintiffs' own theory does not support the dissent's argument for ripeness, as the theory depends on the possibility of a future loss of water. The claim is not ripe.

## VII.        Conclusion

We find the plaintiffs do not have standing and have not made any claim that is ripe for judicial determination. Therefore, the circuit court correctly determined there is no justiciable controversy. Accordingly, the circuit court's decision to grant summary judgment in favor of DHEC is **AFFIRMED**.

**KITTREDGE and JAMES, JJ., concur. HEARN, J., concurring in part and dissenting in part in a separate opinion in which BEATTY, C.J., concurs.**

---

to former members of the Richland County Recreation Commission to assert a claim belonging only to existing members to challenge the constitutionality of legislation that altered the way Commission members were appointed); *Baird v. Charleston Cty.*, 333 S.C. 519, 530-31, 511 S.E.2d 69, 75-76 (1999) (granting public importance standing to a group of doctors who had no personal stake in the matter to challenge tax-exempt bonds they claimed were issued illegally).

**JUSTICE HEARN:**  I concur with the majority's analysis of Appellants' takings and due process claims, but I respectfully dissent on the issue of the public trust doctrine.  Because of the Surface Water Withdrawal Act's inherent connection to the public waterways of South Carolina, I would find that Appellants' public trust claim comes squarely within the public importance exception to standing.  Cognizant of the fact that the public importance exception is used sparingly by this Court, I believe if there is ever a time when the doctrine should be applied, this is it.

The public trust doctrine imposes on a government one of its most time-honored duties.  The doctrine as we know it today traces its roots back to the time of Justinian and was a long-standing legal principle in medieval England before it was carried over to colonial America.  *See* Richard J. Lazarus, *Changing Conceptions of Property and Sovereignty in Natural Resources: Questioning the Public Trust Doctrine*, 71 Iowa L. Rev. 631, 633–36 (1986).  After the American Revolution, "the people of each state bec[a]me themselves sovereign, and in that character hold the absolute right to all their navigable waters, and the soils under them, for their own common use, subject only to the rights since surrendered by the constitution to the general government."  *Shively v. Bowlby*, 152 U.S. 1, 16 (1894).  While the English limited the public trust doctrine to waterways influenced by the tide, the sprawling geography of the United States and its major freshwater rivers led to the expansion of the public trust doctrine by making navigability the touchstone of a public waterway, even where there is no tidal influence.  *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 478–79 (1988).

In its current form, the public trust doctrine protects the public's "inalienable right to breathe clean air; to drink safe water; to fish and sail, and recreate upon the high seas, territorial seas and navigable waters; as well as to land on the seashores and riverbanks."  *Sierra Club v. Kiawah Resort Assocs.*, 318 S.C. 119, 127–28, 456 S.E.2d 397, 402 (1995).  As sovereigns, the "[s]tates possess an 'absolute right to all their navigable waters and the soils under them for their own common use.'"  *Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 631 (2013) (quoting *Martin v. Lessee of Waddell*, 41 U.S. 367 (1842)).  Concomitant with the public's right to enjoy the public trust assets, the public trust imposes on a state three types of duties or restrictions with regard to its management of public trust assets.  To wit,

> [F]irst, the property subject to the trust must not only be used for a public purpose, but it must be held available for use by the general public; second, the property may not be sold, even for a fair cash equivalent; and third, the property must be maintained for particular types of uses.

*Juliana v. United States*, 217 F.Supp.3d 1224, 1254 (D. Ore. 2016) (quoting Joseph L. Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich. L. Rev. 471, 477 (1970)). Inherent in its public trust duties, the State "cannot permit activity that substantially impairs the public interest in marine life, water quality, or public access." *McQueen v. S.C. Coastal Council*, 354 S.C. 142, 149, 580 S.E.2d 116, 120 (2003).

With that in mind, I turn to the public importance exception to standing. The exception provides standing to a plaintiff where an issue is of such public importance that its resolution is required for future guidance. *Sloan v. Dep't of Transp.*, 365 S.C. 299, 304, 618 S.E.2d 876, 878 (2005). Thus, the doctrine affords citizens access to the judicial process to address alleged injustices where standing otherwise would not be available. *See Sloan v. Sanford*, 357 S.C. 431, 434, 593 S.E.2d 470, 472 (2004). We have applied the doctrine in a wide range of cases where we determined an underlying societal interest required resolution. *See, e.g., S.C. Pub. Interest Found. v. S.C. Transp. Infrastructure Bank*, 403 S.C. 640, 645, 744 S.E.2d 521, 524 (2013) (issue of whether statute governing composition of board of directors of state infrastructure bank was unconstitutional fell within public interest exception); *Davis v. Richland County Council*, 372 S.C. 497, 500, 642 S.E.2d 740, 742 (2007) (finding public importance standing to bring action challenging constitutionality of act altering method for electing members of county commission); *Baird v. Charleston County*, 333 S.C. 519, 531, 511 S.E.2d 69, 75 (1999) (doctors had standing to seek injunction against county issuing tax exempt bonds for purchase of medical facility).

Given the interests protected by the public trust, and the fact that public waterways extend to every corner and every county in South Carolina, I find it difficult to imagine a claim better suited to the public importance exception than an alleged public trust violation. The majority states the public importance exception is not appropriate in this case because Appellants' claim is not ripe.[18] Respectfully,

---

[18] Moreover, the circuit judge based his decision to deny public importance standing in part on the lack of previous challenges to the Act. This was error. A history of previous challenges to legislation is not a prerequisite to achieving standing under the public importance exception; if indeed it were, no party could ever raise a novel issue without meeting traditional standing requirements, and the public importance exception would be rendered meaningless. Rather, the hallmark of the doctrine is whether the matter is "inextricably connected to the public need for court resolution for future guidance." *ATC South, Inc. v. Charleston Cnty.*, 380 S.C. 191, 199, 669 S.E.2d 337, 341 (2008). In light of Appellants' allegations regarding violations of

I disagree. Appellants have alleged a current and ongoing injury—the State's abrogation of its duties as trustee to administer and manage the trust corpus. Under their theory, the public trust violation itself is the alleged injury, not a speculative future harm to waterways caused by the Act. Therefore, because of the complex and dynamic character of South Carolina's public waterways, I believe the merits of Appellants' public trust claim require full development at trial to determine the extent to which, if any, the Act has authorized activities that substantially impair the public interest in marine life, water quality, and public access. For example, given the ever-changing nature of rivers and streams, expert testimony would be most helpful to the Court in determining what types of harm have resulted from the Act, and more importantly, whether the State's remaining enforcement powers may be marshalled quickly enough to prevent further harm. The majority points to a number of tools the State retains to protect public waterways, and while I agree, I believe the analysis is incomplete until the record fully demonstrates how quickly those methods may be brought to bear to rectify any impairments to public waterways resulting from the Act.

Accordingly, I would reverse the circuit judge's grant of summary judgment as to the public trust claim. However, rather than rule on the merits of Appellants' claim at this stage without the benefit of a fully developed record, I would simply remand to the circuit court for further proceedings.

**BEATTY, C.J., concurs.**

---

the public trust, I believe the claim implicates significant societal interests deserving of a definitive disposition.